Matthew L. SEIDL, Plaintiff and Counterclaim Defendant,

v.

GREENTREE MORTGAGE COMPANY, Defendant and Counterclaim Plaintiff,

v.

Shirley Sostre, Counterclaim Defendant, and

Mark Van Keuren, individually and d/b/a Modern Computing Concepts, Third Party Defendant.

No. CIV. A. 97–WY–2087–A.

United States District Court, D. Colorado.

Oct. 18, 1998.

Philip L. Dubois, Philip L. Dubois, Shirley Sostre–Oquendo, Sostre Law Office, Boulder, CO, for Matthew L. Seidl.

Rebecca L. Fischer, Chrisman, Bynum & Johnson, P.C., Boulder, CO, Patti Elaine Evans, Isaacs & Evans, PC, New York, NY, for Greentree Mortgage Company.

**ORDER CONSTRUING COUNTER-CLAIM DEFENDANT SHIRLEY SOSTRE'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AS MOTION FOR SUMMARY JUDG-MENT AND GRANTING MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART SEIDL'S MO-TION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT GREENTREE'S MOTION FOR SUM-MARY JUDGMENT**

ALAN B. JOHNSON, Chief Judge.

I.

This matter came before the court on counterclaim defendant Shirley Sostre's Motion to Dismiss and the cross-motions for summary judgment filed by plaintiff/counterclaim defendant, Matthew Seidl and defendant/counterclaim plaintiff Greentree Mortgage. In addition, to the extent that her motion to dismiss does not resolve the counterclaim filed against her, counterclaim defendant Shirley Sostre has also filed a motion for summary judgment on Greentree's counterclaim against her.

II.

Most of the facts are undisputed, although the significance of those facts is disputed. The following facts are undisputed except where noted. Defendant Greentree Mortgage Company (Greentree), is in the mortgage business. In December of 1996, it hired Mr. Mark Van Keuren, a sole proprietor conducting business under the name Modern Computing, on a one-time basis to advertise its mortgages by means of a bulk e-mail advertising campaign.

Greentree provided Van Keuren the body of the advertisement, which contains Greentree's 800 telephone number and its e-mail address "MFGTM@AOL.COM." The body of the advertisement provided by Greentree does not contain the disputed "localhost" address.

Other than this one-time hiring, Greentree has no connection with Mr. Van Keuren. It paid him a flat fee to send the advertisement to a set number of E-mail users—during December of 1996 or January 1997. The time and manner of sending the e-mail as well as the choice of recipients, was up to Mr. Van Keuren who used his own equipment and his own mailing list.

When Mr. Van Keuren prepared Greentree's advertisement for e-mail, he placed the address "nobody@localhost.com" in both the "From" and "Reply to," or return, path fields. These path fields are identifiers for the computer system from which e-mail is delivered. It is undisputed that it was Mr. Van Keuren who chose the name for the "from" and the "reply to" path fields and who configured the e-mail headers to include them.

In January of 1997, Mr. Van Keuren sent out Greentree's advertisement soliciting business to thousands of e-mail addresses. All e-mails sent to inaccurate addresses "bounced-back, like return mail, to the localhost address Mr. Van Keuren had placed on the advertisement." Similarly, all recipients who clicked on the reply button automatically sent replies to the nobody@localhost address.

Plaintiff, Matthew Seidl, is a graduate student in computer science at a Colorado university. In 1995, Mr. Seidl registered "nobody@localhost.com," as a domain name for something named Wraith Interprises

(Wraith). In his deposition, Mr. Seidl testified that Wraith is a d/b/a he developed, but hasn't used.

Domain names are registered with Network Solutions, Inc. (NSI), an entity authorized by the federal government to keep track of all Internet addresses. The parties dispute the effect of such registration. Greentree says registration grants no exclusive rights to use a name. Mr. Seidl says it does.

Greentree has submitted evidence that the "nobody@localhost.com" name Mr. Seidl registered is a generic name, like John Doe, conventionally not assigned to any real person and used as an addressing convention for e-mail or other network traffic for special purposes such as to loop back data. Smallberg Aff. ¶ 5. Often, mail software is configured to discard messages addressed to nobody. *Id.* Mr. Seidl testified in his deposition he registered the "nobody@localhost" name as gag or to keep a telemarketer from getting the name. Very early after registering it he began to receive misdirected replies.

In his Complaint, Mr. Seidl alleges the "from" and "reply to" path fields of the e-mail headers on Greentree's advertisement were intentionally "mis-configured" or "forged" to contain the nobody@localhost address or domain name so that the misdirected mail would not "bounce back" to the sender. Mr. Seidl alleges that his computer received over 7,000 bounce backs from the Greentree e-mail advertisement. Mr. Seidl claims his computer memory was fully taxed by replies that were often profane and insulting and directed to him[1] and that as a result of the incoming messages he was unable to use his computer for three days. Mr. Seidl also claims his reputation among the Internet community suffered because he was identified as the sender of the e-mail advertisement (the "spam").

Shirley Sostre is a Colorado attorney. Mr. Seidl and Ms. Sostre did not meet or communicate until after he began to receive the bounce backs from Greentree's e-mail advertisements in January 1997.

Sending bulk e-mail advertising, or spam, is a controversial and much maligned practice—currently the subject of legislative action in Congress and various state legislatures.[2]

### III. Parties' Claims

#### A. Plaintiff's Claims Against Greentree

Plaintiff Seidl brings the following eight claims for relief against Greentree: (1) violations of the Deceptive Trade Practices Act under Colo.Rev.Stat. § 6–1–105 alleging it was deceptive to imply that Seidl, through a domain name registered to Wraith, was somehow connected with the bulk e-mail; (2) trespass to chattel (by tying up his computer for three days); (3) negligence in breaching an asserted duty not to cause the owner of the nobody@localhost.com domain name damage; (4) negligence per se for alleged violation of Colorado's Computer Crime Act, Colo. Rev.. Stat. § 18–5.5–102; (5) negligent hiring alleging that Greentree should have determined that Mr. Van Keuren would not employ "unlawful" means to send the advertisement; (6) violation of plaintiff's right of publicity by using Mr. Seidl's name (really Wraith's name) without consent; (7) false light invasion of privacy alleging that Greentree made thousands of e-mail recipients believe Mr. Seidl was somehow connected with the junk e-mail because of the use of the domain name; and, (8) violations of 47 U.S.C. § 227—the Junk Fax law by use of "telephone facsimile machine", which plaintiff contends includes e-mail under the definition in the statute, 42 U.S.C. § 227(a)(2)(B). Plaintiff dismissed his claim for outrageous conduct.

#### B. Greentree's Counterclaims against Plaintiff, Seidl, and his Lawyer, Sostre

Greentree brings seven counterclaims against Mr. Seidl and his attorney, Ms. Sostre. Greentree's first four counterclaims are brought under Title IX of the Organized

---

1. The replies were actually directed to Wraith, the registered owner of the domain name.

2. A recent ABA Commission on Advertising paper recommends changes to the existing ABA ethics rules to address attorney advertising and solicitation on the Internet, including changes to allow recipients to "weed out" uninvited e-mail solicitations, or spam, from lawyers. *See* 67 U.S.L.W. 2150.

Crime Control Act of 1970, the Racketeering Influenced Corrupt Organizations Act or RICO, 18 U.S.C. § 1962, alleging Ms. Sostre has conspired with her client in a scheme to extort money from innocent advertisers who use the Internet.

Greentree also brings the following counterclaims under Colorado law: libel per se alleging defamation by Mr. Seidl's and Ms. Sostre's publicity of claims against Greentree by use of press releases on the Internet); false light invasion of privacy; and, interference with prospective contractual relations alleging Greentree lost business because certain persons chose not to do business with it as a result of the publicity of it as an organization that engages in spamming.

### C. Greentree's Third–Party Complaint against Mark Van Keuren

Greentree Mortgage also filed a third-party complaint against Mark Van Keuren, individually, and d/b/a Modern Computing Concepts as third-party defendants. Mr. Van Keuren filed a pro se answer but otherwise has not participated in this case. Greentree's Third-party Complaint is not the subject of any of the motions currently before the court.

### IV. Standard of Review

The standard for dismissal under Fed. R.Civ.P. 12(b)(6), is as follows:

> In considering a motion to dismiss, a court must take the allegations of the complaint at face value and must construe them most favorably to the plaintiff. A court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff could prove no set of facts supporting the claim which would entitle the plaintiff to relief.

*Huxall v. First State Bank,* 842 F.2d 249, 250–251 (10th Cir.1988).

Because the parties have submitted, and the court has considered, matters outside the pleadings in connection with the Motion to Dismiss, the court will convert the motion to one for summary judgment. Because Ms. Sostre filed a separate Motion for Summary Judgment on all of the same issues covered by her Motion to Dismiss, additional notice to the parties is not required.

The standard for the grant or denial of summary judgment is well known:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. If the movant bears the burden of showing the absence of a genuine issue of material fact, the nonmovant may not rest on its pleadings but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.

*Mesa Oil, Inc. v. Ins. Co. of North America,* 123 F.3d 1333, 1336, (10th Cir.1997).

> An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248[, 106 S.Ct. 2505, 91 L.Ed.2d 202] (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *See id.* If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on all essential elements of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23[, 106 S.Ct. 2548, 91 L.Ed.2d 265] (1986). If there is no genuine issue of material fact, we next determine whether the district court correctly applied the substantive law. *See Hirase–Doi,* 61 F.3d at 781.

The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. In so doing, a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim. *See id.* Such a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim. *See id.*

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific fact" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. Fed.R.Civ.P. 56(e); *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888–89[, 110 S.Ct. 3177, 111 L.Ed.2d 695] (1990); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248[, 106 S.Ct. 2505]. To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. *See Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.) *cert denied,* 506 U.S. 1013[, 113 S.Ct. 635, 121 L.Ed.2d 566] (1992).

*Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998).

The Tenth Circuit has also held:

The moving party need not affirmatively negate the nonmovant's claim in order to obtain summary judgment. *Celotex,* 477 U.S. at 322–23[, 106 S.Ct. 2548]. Instead, the movant only bears the initial burden of " 'showing'—this is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325[, 106 S.Ct. 2548].

*Allen v. Muskogee, Oklahoma,* 119 F.3d 837, 840 (10th Cir.1997).

### V. Greentree's Motion for Summary Judgment

Greentree contends it is entitled to summary judgment on all of plaintiff's claims for the following two overarching reasons: One, that Seidl lacks standing because the local-host domain name is registered in Wraith's name. Two, that Mr. Van Keuren is an independent contractor and Greentree is not liable under Colorado law for the acts of an independent contract. Greentree also contends each specific claim should be dismissed for numerous other reasons.

The first overarching reason asserted by Greentree is resolved by Seidl's deposition testimony that Wraith is his d/b/a. The court notes that plaintiff could have avoided this confusion by including his d/b/a in his caption and complaint.

On the second issue, Mr. Seidl contends that Greentree's own third-party complaint against Mr. Van Keuren admits that he is Greentree's agent. He contends that Greentree is liable for its agent's acts. Greentree contends that nothing in its third-party complaint is inconsistent with its position that Mr. Van Keuren was an independent contractor.

Upon review of the materials, the court finds that Greentree's third-party complaint does not admit Mr. Van Keuren is Greentree's agent and does not allege facts that show an agency relationship. Mr. Van Keuren is not officer, director, employee or otherwise associated with Greentree. Greentree hired Mr. Van Keuren to perform a service but in no way directed the manner in which Mr. Van Keuren performed the service, including how he configured the "From" and "Reply to" path fields or the list of e-mail recipients. Thus, the undisputed facts establish an independent contractor relationship between Greentree and Mr. Van Keuren. Under Colorado law this does not give rise to liability for the acts of an independent contractor. *Powell v. City and County of Denver Colo.,* 973 F.Supp. 1198 (D.Colo. 1997).

Generally, a party is not liable for the torts of its independent contractors. *Huddleston v. Union Rural Electric Ass'n,* 841 P.2d 282, 286 (Colo.1992).

Under Colorado law, "[a]n independent contractor is one who engages to perform services for another, according to his own methods and manner, free from direction and control of the employer in all manners relating to the performance of the work." *Scott Wetzel Serv. Inc. v. Johnson,* 821 P.2d 804, 814 (Colo.1991) (Rovira, C.J., dissenting) (citations omitted). "Independent contractors, however, are not free from all control. They may be subject to control sufficient to ensure that the end result contracted for is reached, even though they are not subject to control over the means and methods of accomplishing that result." *Carpet Exchange of Denver, Inc. v. Industrial Claim Appeals Office,* 859

P.2d 278, 281 (Colo.App.1993) (citations omitted). By contrast, an employee is "subject to control over the means and methods of work as well as the ends and results." *Id.* (citations omitted).

The federal courts have developed a more expansive test for determining whether an individual is an employee or an independent contractor. The focal point of the inquiry is "whether the individual is economically dependent on the business to which he renders service or is, as a matter of economic fact, in business for himself." *Dole v. Snell,* 875 F.2d 802, 804 (10th Cir.1989) (quotation and citation omitted). Six factors are considered in making that determination: (1) the degree of control exercised by the employer over the work; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the business relationship; (5) the degree of skill the work calls for; and, (6) the extent to which the work is integral to the employer's business. *Id.* at 805 (citation omitted). *Powell,* 973 F.Supp. at 1202. *Accord Continental Bus System, Inc. v. NLRB,* 325 F.2d 267, 271 (10th Cir.1963) (with independent contractor direction and control are limited to the result and do not apply to the method and manner of the rendition of the service); *Williams v. Burns,* 463 F.Supp. 1278, 1284 (D.Colo.1979) ("the torts of an independent contractor are generally the sole responsibility of that independent contractor").

The court must reject plaintiffs' theory that Mr. Van Keuren was Greentree's agent because he acted "for or in place of" Greentree when doing the mailing. Citing Colo Pattern Jury Instructions 3d 7:3 and 7:11. The court finds that the cases cited by plaintiff are inapposite to this case because the facts of those cases, and the relationship of the parties therein, are entirely distinguishable from the independent contractor relationship established by the undisputed facts in this case.

An independent contractor ordinarily performs services for another. If this court were to adopt plaintiff's position that such actions make an independent contractor an agent because he or she "acts for" the other, it would eliminate the distinction between independent contractor and agent. As was stated in *Powell,* an "agent is one who represents (and may bind) the principal contractually." 973 F.Supp. at 1201 n. 2. There is no evidence that Mr. Van Kueren had the ability to bind Greentree contractually. This fact alone distinguishes this case from the insurance law cases by plaintiff. On the undisputed evidence, Mr. Van Kueren cannot be considered an agent to Greentree's principal. Instead, the undisputed facts show that Mr. Van Keuren is an independent contractor.

■ The court's finding that the undisputed facts show that Mr. Van Kueren is an independent contractor resolves all claims based upon plaintiff's allegations that Greentree is vicariously liable for Mr. Van Kueren's action. The only claim based on Greentree's own actions is the claim for negligent hiring. However, where Greentree did not hire Mr. Van Keuren as its employee or agent, it contends that the elements of negligent hiring are not met under Colorado law. Greentree is correct. *See Acme Delivery Service, Inc. v. U.S.,* 817 F.Supp. 889, 892–93 (D.Colo.1993) (independent contractors not agents of employer and therefore claim for negligent hiring dismissed). Accordingly, Greentree is entitled to summary judgment on all of plaintiff's claims.

Because the court has determined that Greentree is entitled to summary judgment on the above-discussed basis, the court need not address the specific reasons Greentree alleges it was entitled to summary judgment on each of plaintiff's claims for relief.

### VI. Sostre's and Seidl's Motions[3]

#### A. Seidl's Motion for Summary Judgment Re: Van Kueren as Agent

To the extent Mr. Seidl's Motion for Summary Judgment sought judgment that Greentree is liable for the actions of Mr. Van Kueren because he was Greentree's agent, that issue has been resolved, *supra,* in favor

---

**3.** In addition to his own brief, plaintiff adopts counter-defendant Sostre's brief in support of her Motion for Summary Judgment.

of Greentree. Accordingly, that portion of Mr. Seidl's Motion will be denied.

### B. False Light Invasion of Privacy

Greentree's sixth counterclaim is for false light invasion of privacy. Greentree contends that through the publication of the defamatory statements it was falsely associated with highly offensive conduct and as a result has had its privacy invaded by being placed in a false light.

The rule in Colorado is that, distinct from "a tort of defamation, which involves injury to reputation, invasion of privacy involves injury to the person, primarily through mental and emotional distress." *Bolduc v. Bailey*, 586 F.Supp. 896, 901 (D.Colo.1984). The court went on to hold that "the Court does not believe that an association of individuals, such as (the claimant), may claim collectively an invasion of privacy, particularly since the rule on damages appears on its face to refer to individual persons." *Bolduc*, 586 F.Supp. at 902; *C.f. McCammon & Associates, Inc. v. McGraw–Hill Broadcasting Company*, 716 P.2d 490 (Colo.Ct.App.1986) (affirming summary judgment in favor of corporate plaintiff on corporate defendant's claim of false light invasion of privacy without discussing whether claim may be maintained by corporation).

Greentree is not an individual; it is a limited partnership. Greentree attempts to avoid the rule announced in *Bolduc, supra,* by its contention that one of its limited partners is an individual. However, the limited partner whom Greentree identifies in its response as being painted in a false light is not the named party in this lawsuit. Accordingly, the court finds and concludes that Greentree lacks standing as a limited partnership to bring a counterclaim against Ms. Sostre and Mr. Seidl for false light invasion of privacy and they are entitled to summary judgment dismissing this counterclaim.

### C. Interference with Prospective Contractual Relations

Greentree's counterclaim for interference with prospective contractual relations is based upon its allegation that as a result of (1) Mr. Seidl's sending negative reply e-mail to their prospective customers; and, (2) the negative publicity Mr. Seidl and Ms. Sostre generated, potential customers decided not to consider doing business with Greentree.

Colorado has adopted § 766B of the Restatement (Second) of Torts for the elements of intentional interference with prospective contractual relation. *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.*, 690 P.2d 207, 210 (Colo.1984); *Caven v. American Federal Savings and Loan Association of Colorado*, 837 F.2d 427, 431 (10th Cir.1988); *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo.1995). The elements of this cause of action are: (1) the existence of a prospective business relationship between Greentree and another; (2) the counterclaim defendants' knowledge of the existence of the prospective business relationship; (3) the counterclaim defendants intentionally and improperly induced another not to enter into a contractual relationship with Greentree; and, (4) resulting damages to Greentree. *Amoco Oil*, 908 P.2d at 500.

To establish a claim for tortious interference with prospective business relations, a plaintiff must show intentional and improper interference preventing the formation of a contract. *Behunin v. Dow Chemical Company*, 650 F.Supp. 1387, 1392–93 (D.Colo.1986); *Dolton v. Capitol Federal Savings and Loan Association*, 642 P.2d 21, 23 (Colo.Ct.App.1981). The defendant can interfere either by inducing or causing a third party not to enter into or continue relations, or by preventing the plaintiff from acquiring or continuing the relations. *Behunin*, 650 F.Supp. at 1393. It is not necessary to prove an underlying contract. *Wasalco, Inc. v. El Paso County*, 689 P.2d 730, 732 (Colo.Ct.App.1984). However, *a protected relationship exists only if there is a reasonable likelihood or probability that a contract would have resulted; there must be something beyond a mere hope. Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 898 (3rd Cir.1981); *Thompson Coal Co. v. Pike Coal Co.*, [488 Pa. 198,] 412 A.2d 466, 471 (Pa.1979); *cf. Plaza Esteban v. La Casa Nino, Inc.*, 738 P.2d 410, 412 (Colo.Ct.App.1987) (requiring a "firm offer"), *rev'd on other grounds*, 762 P.2d 669 (Colo.1988).

*Klein v. Grynberg,* 44 F.3d 1497, 1506 (10th Cir.1995) (underlined emphasis added).

In this case, Greentree's evidence shows only a mere hope that Greentree would do business with the persons it says were deterred from doing business with it. Greentree submitted exhibits showing that in casual e-mail a person asked Mr. Seidl for the name of the company involved because he said he was "shopping for a loan and don't want to use them." Evan's Aff. Ex. LL. Another person opined by e-mail that he hoped additional publicity would hurt Greentree's potential business and also wrote, "By the way I'm going with First Financial Equities." *Id.* Ex. JJ.

These exhibits fall far short of showing there is a reasonable likelihood or probability that a contract for a mortgage between these persons and Greentree would have resulted. There is no evidence that Greentree had any prior relationship with these persons or that these persons had any prior knowledge of Greentree's services. Greentree has failed to show that it had anything other than a mere hope that these persons, or any of the other persons contacted, would enter into mortgage contracts with Greentree. As in *Klein,* there is no evidence that these persons had any intent to do business with Greentree or that there was any reasonable probability that Greentree would have received economic benefits from these persons. Accordingly, as in *Klein,* Greentree has failed to make out a prima facie case for tortious interference with prospective business advantage, 44 F.3d at 1506, and counterclaim defendants are entitled to summary judgment on this claim.

### D. RICO Counterclaims

The counterclaim defendants move to dismiss the RICO counterclaims, or alternatively for summary judgment because they contend the counterclaims fail to comply with the rules of pleading because: (1) the counterclaims fail to state the factual predicate acts of mail and wire fraud with particularity as required by Fed.R.Civ.P. 9(b); (2) the counterclaims are devoid of objective facts; *i.e.,* a specific statement, representation, document, name, date or other verifiable fact establishing mail or wire fraud; and, (3) the counterclaims fail to allege each of the eight elements of RICO with particularity.

The gist of Greentree's RICO counterclaims is that Ms. Sostre is a self-promoted Internet expert who has joined with her client in a scheme to extort money from Internet advertisers. This scheme allegedly involves the 1996 or 1997 "fraudulent" re-registration of the generic name "local host" for the purpose of claiming damages when the generic name is innocently used for misaddressed and undeliverable e-mail. According to Greentree, the re-registration of a name that Mr. Seidl knew attracted unwanted e-mail is evidence of his purpose of using a name to ensnare unsuspecting advertisers like it, and other similarly situated advertisers, with false claims for damages. The RICO counterclaims involve allegations that Ms. Sostre and Mr. Seidl prepared and sent out e-mail and participated in the web page describing the lawsuit and soliciting funds to help pay for the lawsuit.

A viable RICO claim requires eight essential elements: (1) the defendant; (2) through the commission of two or more of the enumerated predicate acts; (3) which constitute a "pattern"; (4) of racketeering activity; (5) directly or indirectly participates in the conduct of; (6) an enterprise; (7) the activities of which affect interstate commerce; and, (8) the plaintiff was injured in its business or property by reason of such conduct. *Brooks v. Bank of Boulder,* 891 F.Supp. 1469, 1476 (D.Colo.1995).

1. First Counterclaim 18 U.S.C. § 1962(a)

Greentree Mortgage Company's first counterclaim is for violation of subsection (a) of 18 U.S.C. § 1962(a). This subsection states it is unlawful for any person who has received any income from a pattern of racketeering activity to use or invest in any operation affecting interstate commerce. Greentree alleges Seidl and Sostre solicited defense funds over the Internet. It alleges that this solicitation of funds constitutes a pattern of racketeering activity and that income was used in the operation of Seidl's computer business and Sostre's law practice in furtherance of their illegal activity, thereby damaging Greentree.

Ms. Sostre and Mr. Seidl contend Greentree lacks standing to assert a violation of 18

U.S.C. § 1962(a) because Greentree failed to allege any facts showing injury from the *use or investment of the income* derived from the racketeering activity, not just injury from the activity itself. *Grider v. Texas Oil and Gas Corp.*, 868 F.2d 1147, 1149–1150 (10th Cir. 1989).

The court finds this last contention is dispositive of Greentree's RICO counterclaim under this subsection of § 1962. Greentree has failed to come forward with any evidence on summary judgment to show that Ms. Sostre or Mr. Seidl obtained any income from this alleged scheme. Greentree has failed to come forward with any evidence to raise an issue of fact showing that Ms. Sostre or Mr. Seidl used or invested any income derived from the alleged scheme. In the absence of any evidence on the foregoing matters, Greentree lacks standing to bring this claim because it has failed to show any injury from the use or investment of the income derived from the alleged racketeering activity, not just injury from the activity itself.

2. Second Counterclaim, 18 U.S.C. § 1962(b)

■ The second counterclaim is for violation of subsection (b) of 18 U.S.C. § 1962. This subsection states it is unlawful for any person through a pattern of racketeering activity to acquire or maintain an interest in or control of any enterprise affecting interstate commerce.

Greentree's claims regarding enterprise are confusing. It alleges that Wraith and the Sostre Law Offices are enterprises under RICO. It also alleges that the "association-in-fact of Seidl and/or Wraith Interprises and the Sostre Law Firm and/or Sostre together formed an enterprise" under RICO. Counterclaim ¶ 91–93. However, their counterclaims fail to provide any specific allegations regarding the structure or operation of Wraith, the Sostre Law office or the alleged association-in-fact.

The counterclaim defendants contend that Greentree failed to plead the required detail needed to establish a violation of 18 U. S .C. § 1962(b) pertaining to the illegality of maintaining interest or control in an enterprise through a pattern of racketeering. They further contend that the alleged predicate acts don't support a pattern of racketeering

activity, a pattern that must show a threat of continued activity. *McDonald v. Schencker*, 18 F.3d 491, 498 (7th Cir.1994). They also contend that Greentree failed to plead the enterprise element of a RICO claim, an enterprise that must be separate and apart from the racketeering activity. *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

■ The court must agree. The counterclaim defendants are correct that Fed. R.Civ.P. Rule 9(b) requires a heightened standard of pleading for a RICO claim. *See Saine v. AIA Incorporated*, 582 F.Supp. 1299, 1303 (D.Colo.1984).

■ For its predicate offenses, Greentree alleges that Ms. Sostre and Mr. Seidl are guilty of mail fraud and wire fraud. See 18 U.S.C. §§ 1341 and 1343. Where there is more than one defendant, the RICO plaintiff's obligation under Rule 9(b) is to specify the particular acts of each defendant. Greentree has failed to do so in this case. Where the predicate acts are alleged to be wire fraud, Rule 9(b) requires the RICO plaintiff to state the specific number of wires, the precise dates, and how they further the scheme. *Brooks*, 891 F.Supp. at 1477.

■ In *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1541–45 (10th Cir.1993), the court discussed the proof necessary to show a pattern of racketeering activity, including the need for proof of a relationship between the predicate acts and the more difficult proof of a threat of continuing activity. *Id.* Greentree has failed to advance evidence approaching the specificity needed to state a RICO claim. At best, its allegations show a single scheme directed at one victim with one discrete goal. As noted in *Sil–Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990), this is insufficient. Although a single scheme may suffice under certain circumstances, it will not suffice if there is no indication of a threat of continuing illegal activity. It is not enough to allege a threat of continuing illegal activity, *see Alter v. DBLKM, Inc.*, 840 F.Supp. 799, 810 (D.Colo. 1993), otherwise a simple conclusory allegation would always show a pattern. Green-

tree must allege specific facts that show such a threat and it has failed to do so.[4]

■ Greentree's allegations regarding acquiring or maintaining an interest in or control of an enterprise are stated in the most vague and conclusory manner. See Counterclaim ¶ 136. This is insufficient to meet the requirements that such a claim be stated with particularly as to each defendant. Greentree has also failed to show an "enterprise" within the meaning of RICO. See 18 U.S.C. § 1961(4) (enterprise means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity.") To allege an enterprise within the meaning of RICO, there must be a "group of persons associated together for a common purpose of engaging in a course of conduct ... [It is] proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

Because the counterclaims use the generic term "enterprises" in the allegations, it is impossible to determine what is being alleged for Mr. Seidl or Ms. Sostre. When the counterclaim uses the term enterprises, it is not possible to determine if it means the Sostre Law Offices, Wraith, or the alleged association-in-fact of Mr. Seidl and Ms. Sostre. There are no specific facts alleged about Wraith or the Sostre Law offices. Accordingly, the entire complaint falls far short of the specificity required under Rule 9(b). The lumping together of defendants in allegations of fact is impermissible under the requirement that a RICO claim be pleaded with particularity.

Further, because Greentree alleges the same purpose for the association-in-fact enterprise of Mr. Seidl and Ms. Sostre as it alleges is the purpose of the predicate acts, and therefore it fails to allege an enterprise with an ascertainable structure separate and apart from the alleged racketeering activity.

*See U.S. v. Davidson*, 122 F.3d 531, (8th Cir.1997).

**3. Third Counterclaim, 18 U.S.C. § 1962(c)**

The counterclaim defendants contend that Greentree fails to meet the elements of 18 U.S.C. § 1962(c), making it unlawful for any person employed by or associated with any enterprise to conduct or participate in the conduct of such enterprise's affairs through a pattern of racketeering activity.

For the reasons stated above, the counterclaims fail to state a claim with sufficient particularity because it lumps together the defendants and also lumps together the alleged enterprises and makes vague and conclusory allegations.

■ Further, an attorney does not participate in the operation or management of an enterprise by offering legal advice or otherwise represent a client. *Azrielli v. Cohen Law Offices*, 21 F.3d 512 (2nd Cir.1994). Greentree contends that Ms. Sostre knew about and acquiesced in Mr. Seidl's "fraudulent" re-registration of the nobody@localhost.com domain name. This allegation is insufficient to show she conducted or participated in the conduct of a RICO enterprise. It is undisputed that Mr. Seidl had the domain registered for several years before he met Ms. Sostre and that she gave him no advice about the re-registration. Greentree makes conclusory allegations of Ms. Sostre's participation in the alleged enterprise, but provides no specific allegations to show that Ms. Sostre in any way participated in the direction or management of a RICO enterprise or participated in the conduct of a RICO enterprise.

**4. Fourth Counterclaim 18 U.S.C. § 1962(d)**

■ The fourth counterclaim is for violation of subsection (d) of 18 U.S.C. § 1962. This subsection makes it unlawful for any person to conspire to violate any of the above

---

**4.** Evidence that Mr. Seidl previously contacted another advertiser and sent that advertiser a bill on behalf of a party not involved in this suit is not such evidence. That evidence reveals that the other billing did not involve the nobody@lo- calhost.com address's receipt of e-mail advertisements or "packets," a fact which is critical to how Greentree alleges the predicate acts, the racketeering, and the conspiracy worked.

mentioned provisions of this Act. Greentree alleges such conspiracy was committed by Mr. Seidl and Ms. Sostre to further their illegal activities, and, as a result, it was damaged.

Sostre contends that Greentree failed to meet the elements of 18 U.S.C. § 1962(d), requiring that in order to state a claim under this section, Greentree must show that Ms. Sostre conspired to violate at least one of the other three foregoing sections of 18 U.S.C. § 1962. Ms. Sostre maintains that Greentree failed to show any further involvement in this matter by her other than her role as counsel to Mr. Seidl.

 This court takes notice of the recent U.S. Supreme Court ruling on RICO that, "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 476, 139 L.Ed.2d 352 (1997). While *Salinas* states that a conspiracy can occur with the mere support of a co-conspirator and doesn't require an overt act by both conspirators, in the case at hand, Greentree fails to allege the elements of a conspiracy with sufficient particularity.

> [I]n order to state a viable claim under § 1962(d) [plaintiff] must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise though a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish these goals.

*Goren v. New Vision International, Inc.,* 156 F.3d 721, 731 (7th Cir.1998).

As in *Goren,* the counterclaim plaintiff in this case has failed to provide details as to the roles to be played by each defendant in the enterprise. Once again it is not possible to determine what enterprise is the subject of each allegation because the alleged enterprises are lumped together. The counterclaim is utterly devoid of allegations indicating either a specific agreement between Mr. Seidl and Ms. Sostre to participate in the affairs of a specific enterprise or an agreement to the commission of two specific predicate acts. As in *Goren,* the counterclaim

cannot be saved by its many conclusory and vague allegations concerning the collective conduct of the "defendants." It is well established that a complaint may be dismissed if it contains only conclusory, vague and general allegations of a conspiracy. ·

*Id.* at 732.

In sum, the court finds that the so-called RICO counterclaims are nothing more than Greentree's state law claims recast in vague and conclusory RICO language. Greentree has failed to plead the four RICO counterclaims with the required particularity and therefore fails to state a claim under RICO, and, accordingly, the counterclaims based on RICO must be dismissed.

### E. Libel Per Se

#### 1. The Statements at Issue

All of the following material was posted for viewing on Mr. Seidl's Internet Web page devoted to the express purpose of publicizing the lawsuit. These materials from the Web page are found at Ex. Y to the Evan's Affidavit. All page citations are to said exhibit. The materials are reprinted at length in order to understand their context. The exact statements that Greentree alleges are libel per se are underlined. To avoid confusion, all other original underlinings in the materials have been deleted. Following each statement is the approximate date it is alleged to have been posted for viewing on the Web page. Greentree alleges that each was transmitted a minimum number of 1,887 times from Boulder and/or Longmont, Colorado.

In addition to the material cited, a copy of the Complaint was also posted for viewing on the Web page. Greentree does not allege that publication of the Complaint itself to persons unconnected with the lawsuit was libel. Therefore, no part of the court's decision today involves the issue of whether publication of a copy of the Complaint via the Internet is subject to the privilege.

The following are the alleged defamatory statements posted for viewing on the Internet:

## (a) February 24, 1997, demand letter from Sostre to Greentree:

February 24, 1997

Mr. John Merinda,
President Greentree Mortgage Company
10005 Atfiums & Greentree
Marlton, NJ 08053

### THE SOSTRE LAW OFFICE
1920 13th Street, Suite A
Boulder, Colorado 80302
Tel: 303–413–9332

Dear Mr. Merinda:

This office has been retained as legal counsel for Mr. Matthew Seidl regarding a bulk electronic mail advertisement received from your company. It appears that on or about January 12, 1997 an unsolicited bulk E-mail advertisement was sent by your company to a lengthy list of recipients. The E-mail address of the sender was listed as "nobody@localhost.com." Any mail that did not reach its intended recipient automatically "bounced" back to "nobody@localhost.com." All replies in the advertisement accomplished through the "reply" function of the recipient's E-mail software package were received by nobody@localhost.com. Any requests to be taken off the distribution list were also received by nobody@localhost.com.

My client, Mr. Seidl, owns the name nobody@localhost.com. Therefore, your use of his name *constitutes misappropriation for fraudulent purposes.* Furthermore, it is very simple to ascertain whether a particular address or domain name on the Internet is already in use by another person. Therefore, *your use of my client's name was either reckless, willful and wanton or at best, negligent.*

As a result of your mass mailing Mr. Seidl has been the recipient of over seven thousand (7,000) articles of mail totaling about 31 megabytes of memory. That is equivalent to over 20 floppy disks filled to capacity. He has also received a great deal of hate mail from irate recipients of your advertisement, his professional reputation has been disparaged and he has been the recipient of numerous profane insults directed at him personally and at his business practices, including some messages received from companies Mr. Seidl seeks employment from.

In addition to the irreparable damage that has been done to his professional and personal reputation, and therefore to his future employment possibilities, the massive volumes of mail received by Mr. Seidl effectively shut down his ability to use his computing system for other business and academic purposes for several days while the computer was processing this data

I understand that Greentree Mortgage Company is licensed to do business in Colorado and is registered with the Colorado Secretary of State. You should therefore be aware that *in addition to any common law torts and crime you may have committed, your conduct may also have violated Colorado's Computer Crime statute (15 C.R.S. 18–5 .5–102). Deceptive Trade Practices Act (C.R.S.156–1–105) and prevention of telemarketing fraud laws (C.R.S. 156–1–301 et seq.). As you are engaged in interstate commerce, the provisions of the federal Wire Fraud Act (18 U.S.C. 151343), the Computer Fraud and Abuse Act (18 U.S.C. 151030) and the Racketeer Influenced and Corrupted Organizations (RICO) laws (18 U.S.C. 151961) and possibly the restrictions on use of telephone equipment contained in 47 U.S.C. 15 227 may also apply.* We are continuing our investigation of this case in order to determine the full extent of Mr. Seidl's legal remedies.

*Having been seriously damaged,* my client has tried to reach you repeatedly to discuss this situation with you or with someone within your company and has been repeatedly rebuffed. He has, therefore, been forced to retain me to protect his rights and to represent him in his efforts to be made whole. Mr. Seidl has not given up the hope that you and he may be able to resolve this problem and that he may be made whole without having to resort to costly litigation. I ask that you contact me by March 15, 1997, at [phone number] to discuss the possibility of settling this claim amicably.

Sincerely,

Shirley Sostre

**1308**

Evan's Aff. Ex. Y at 8–9; Posted between February 24 and August 28, 1997.

### (b) 9/1/97 Press Release

Current Events
8/29/97
 Served Greentree's Colorado office with papers

Press Releases
4/28/97
news.admin.net-abuse.email initial release
5/12/97
Denver Business Journal
8/18/97
Computerworld—Search for Seidl, as I can't seem to link straight to the story.
9/1/97
Press Release
*Localhost.com has been the victim of e-mail forgery.* On 1/12/97, a mass E-mail ad was sent out to thousands of people, advertising the services of Greentree Mortgage Company. *Both the From and Reply to headers were forged to point to nobody@localhost.com, which is registered to us.* As a result, we were inundated with bounced messages and angry responses. We tried to work things out with Greentree and got nowhere, so we have decided to take whatever legal actions we have to take to restore our good name and recover *the damages we suffered.* We are doing our part to put an end to this type of netabuse. For more info and latest updates on this case, check out http:// c s.colorado.edu/-seidl/lawsuit.
Go to the localhost.com legal Home Page
Matthew L. Seidl

*Id.* at 6. Posted approximately April 28, 1997.

### (c) Denver Business Journal Reprinted as Press Release

*The Denver*
**Business Journal**
Search Index of Business Journal Back Issues

 May 12, 1997 Index

May 12, 1997
Unwanted e-mail fills computers
Some users get "hit" thousands of times

Ian Olgairson Business Journal Staff Reporter

Imagine this scenario: A company sends out tens of thousands of junk e-mails around the country, but instead of putting its own return address on the pitch it puts yours.

Not only has the nefarious move sullied your good name, but now you have to deal with thousands of angry replies instructing just where you can stick the advertisement, also known as "spam."

*The practice, called forged spamming,* is becoming a common tactic among purveyors of the maligned marketing ploy. By routing the returns to another e-mail address, spammers can get their message out while avoiding the often irate backlash that can clog computer systems and shut down operations.

"This is real [sic] unfunny if you happen to be the victim," said Jack Pickard, editor of Boardwatch Magazine, relaying accounts of companies getting hit with more than 100,000 unwanted messages because of the dodge.

Matthew Seidl, a computer science student at the University of Colorado, wasn't laughing when he woke up one morning in January to find 2,000 messages gumming up his system.

The doctoral candidate quickly realized what had happened when he began opening the mail. While much of it had bounced—returned unopened because of a wrong address—the rest were requests for immediate removal from the mailing list written with varying degrees of contempt. The e-mail originated from Minneapolis-based Greentree Mortgage, but it listed nobody@localhost.com as the return address. Seidl, who owns the domain name localhost.com, doesn't have a "nobody" designation but, the e-mail came to him anyway because of the domain name.

Seidl's system, he laments, was unusably slow for days and the replies continued to trickle in for weeks before reaching a total of more than 7,000 unwanted messages. "Tens of thousands of people now have a negative opinion of me and the domain I use for consulting," he said.

Spamming incites unusually strong reactions, turning denizens of the Net into a modem equivalent of pitchfork-wielding villagers. The vigilante brand of justice can produce anti-spamming, eye-for-an-eye tactics to return the favor, including one incident of an angry recipient retaliating against a listed phone number by programming a phone to auto redial the spammer for 24 hours.

One Web page frequented by Internet service providers regularly posts messages from victims of forged spamming begging for mercy to stop the spamming from Internet purists.

There are even unconfirmed reports that spammers use forgery as a way to sabotage the competition or take a swing at companies that specialize in solicited e-mail.

"It's a form of vandalism that could affect a brand or the goodwill of customers" said Dan Murray, a marketer with Denver-based personalized e-mail service Mercury Mail.

One message sent to Seidl warned, "Now, be prepared to be harassed yourself" Another-included a bill for SSO for the advertising space.

Though the promised backlash never materialized, he's still trying to get satisfaction *from Greentree for the damage it caused his business, studies and professional reputation.* A Greentree spokesman could not explain the incident, *but Seidl's lawyer doubts it was an accident.*

*"I think it is completely impossible for anybody to do this accidentally"* says *Shirley Sostre,* an attorney who specializes in Internet issues. "If Greentree had not done what they did, their computer system would have crashed for three days instead."

Sostre hasn't decided to file a lawsuit yet, but she doesn't rule it out as a means of sending a warning about spamming.

"We need to get the wheels rolling to get this kind of abuse stopped," she said. "It's becoming more and more pervasive."

Sostre was cagey about what legal argument would be used in such a case, *but it could range from fraud to trespass* to current statutes that regulate telemarketing.

And she said Seidl isn't alone in thinking about taking action over his e-mail blitz. Said the Boulder attorney, "I've basically got a constant stream of complaints."

*1987, The Denver Business Journal*

*Id.* at 18–20. Posted May 12, 1997.

### (d) COMPUTERWORLD Article Reused as Press Release
### COMPUTERWORLD

Spam attacks send angry firms to court
Stewart Deck and Matt Hamblen
(08/18/97)

Internet spam is no longer a joke to angry businesses. They increasingly are fighting back with civil and criminal lawsuits and offering rewards for information leading to arrests. In some cases, users are even trying chargeback tactics.

Driving the get-tough attitude is mounting frustration over crippled and lost business because of overloaded electronic-mail servers, trademark infringement and the nefarious combination of *return address impersonation* known as spoofing and blasts of spamming E-mail advertisements. Faced in some instances with death threats, exasperated and angry World Wide Web site administrators are trying anything and everything including offering bounties for the names of spammers and risking online vendettas in the process

IMAGE AT STAKE

Particularly vulnerable to spamming which some observers call "Internet terrorism" is a company's image, which businesses spend untold dollars building, maintaining and protecting.

One high-profile example is Samsung America, Inc.'s nightmare, which began July 19 when a fake advertisement blasted across the Internet to millions of electronic mailboxes. The angry replies caught Samsung by surprise [as] it hadn't sent out the advertisement.

Other messages bearing Samsung's return address have swamped unsuspecting mailboxes since then, including a missive purportedly from a Samsung attorney claiming "fraudulent and actionable transgressions" on the recipient's part. Two

of Samsung's Web-hosted clients La Costa Resorts and Big Dog Sportswear also had suggestive and misleading advertising messages sent out with their names attached. They, in turn, have been inundated with complaints.

Samsung has been so hard hit getting 6,000 to 10,000 E-mail messages per day and hundreds of telephone calls worldwide that the FBI is looking into the matter. Samsung has spent millions of dollars on its brand image and desperately wants the spamming to stop. "We assume whoever is doing this buys lists of E-mail addresses from someone," said Sang Cho, Samsung's in-house counsel, in an interview with COMPUTERWORLD.

But the company doesn't know why or who holds the grudge. It intends to file civil and criminal charges when the perpetrator is unmasked.

Fake ads are the latest twist in spoofing and spamming. The Dr. Seussian terms describe an underhanded sneak attack that tries to get ads in front of as many unsuspecting eyeballs as possible by impersonating a responsible sender. For example, Strong Capital Management, Inc., a financial services company in Menomonee Falls, Wis., is suing a spammer for allegedly stealing its address, thinking that recipients would be more likely to open mail from a prestigious firm than an ordinary Internet marketer. Such mail is hated by recipients and is a bane of Internet service providers.

FIGHTING BACK

But now the impersonated legions are beginning to fight back. Although there are no results in any of these cases yet, here is a sampling of businesses going on the offensive with their beefs:

Two operators at SFF Net, a commercial online service used by science fiction and fantasy writers, have filed suit in Kings County, N.Y., against Carlos Lattin for sending out spamming E-mails with their *forged return addresses*. Their lawsuit claims trademark infringement, unfair competition, defamation and false designation of origin. The plaintiffs used New York laws to make the alleged impersonator's Internet service provider divulge Lattin's name.

A novice junk mailer was sued in May by an online floral information service run by Tracy LaQuey Parker, an Internet author and education market development manager at Cisco Systems, Inc. Parker opened the site's electronic mailbox one morning in March and saw what Samsung, La Costa and SFF Net have experienced: an avalanche of returned E-mail and angry letters. "I was shocked by the onslaught," Parker said.

Jon Tara, operator of San Diego's Live.Net site, has experienced the same problem, but he hasn't been able to track down the spoofing impersonator. He is offering a $100 reward for positive personal identification of the spoofer. A message on the site from Tara to the spamming perpetrator says, "I am going to hound you to the ends of the earth once I find out who you are. You will regret having used a Live.Net return address. If you are lucky, I will never find out who you are. If you are unlucky, I will. It will be the worst luck that you've ever had" Tara has fought with a service provider who has stopped shutting down spammers and wont provide Tara with identity information, claiming privacy requirements. The provider has called Tara's bounty offer vigilantism.

In February, Matthew Seidl, a Colorado University computer science student, filed a lawsuit against *Greentree Mortgage and an unnamed bulk E-mailer for allegedly sending out a batch of spam with Seidl's "nobody@localhost.com" address in the From and Return-Path headers.*

Seidl said in an Internet posting that he decided to take "whatever legal actions we have to take to restore our good name and *recover the damages we suffered.* We are doing our part to put an end to this type of *net abuse.*"

UNLIMITED ACCESS

Such attacks are difficult to deal with, said Nina Bums, an analyst at Creative Networks, Inc. in Palo Alto, Calif "Wackos have so much access to information that it becomes scary for an individual," she said. "But until authentication and digital signature technology become more widespread, I'm not sure what the answer is."

"We need some sort of digital Caller ID," said Jonathan Wheat, an analyst at the National Computer Security Association in Carlisle, Pa. Until then, Wheat said, this may be the price we pay for ever-increasing Internet connectivity.

**See related stories:**

Service providers won't release names

Internet providers fight back against spammers

## COMPUTERWORLD

Spam, spam, spam, spam: Internet Spam Links

Antispam organizations,

Antispam organizations

●The Coalition Against Unsolicited Commercial E-mail (CAUCE) A group of Internet users who are fed up with spam have formed a coalition whose purpose is to amend 47 USC 227—the section of U.S. law that bans "junk faxing" -so that it will cover electronic mail as well. This site has an extensive set of links to antispam resources, groups and information

We will not eat green eggs and spam: Antispam pages

●Get that spammer-! An antispam page with useful links to tracing tools as well as nicely categorized articles, instructions and complaints.

●Boycott Internet Spam This page is a good reference tool for antispam resources. It provides links to "practical tools to boycott spam," a tutorial on how to complain about spam, who the bad guys are and more.

●Netizens Against Gratuitous Spamming (NAGS) This site provides information about how to locate the responsible companies and has an archive of some existing spams.

●The Netizen's Guide to SpamAbuse and Internet Advertising General information on spam and notorious spammers, links to other antispam pages, spam news and spam-fighting programs. Maintained by Soren Ragsdale.

●Spam-o-rama From L–Soft. the company that licenses the Listserv software, information about spam.

●Blacklist of Internet Advertisers "A list describing advertising offenders and their offensive behavior."

●Responsible sites Internet providers and Web hosts who act responsibly when dealing with spammers. Compiled on the Boycott Internet Spam Page.

●Links to Do–Not–Call/Mail/E–mail Lists Compiled by The Consumer Information Organization, which "provides a collection of information sources consumers can use to help themselves."

●Spam Media Tracker This site tracks articles in the media about Internet spam. That's a lot of spam!

FAQs

●alt.spam FAQ or "Figuring out fake E-mail & Posts" This FAQ will help in deciphering which machine a fake E-mail or post came from, and who (generally or specifically) you should contact.

●The Net Abuse FAQ General spam and abuse information.

●The Cyberpromo FAQ This exists to help people or companies who have been the target of Cyber Promotions, widely acknowledged as the biggest and baddest spammer on the 'net'.

●All da'FAQs Links to some FAQs dealing with spam.

●Stop Spam FAQ

●Spam FAQ How to figure out which site the Spam came from.

People and companies going after spammers

●Localhost.com vs. Greentree Mortgage and the Bulk Mailers Matthew Seidl, a consultant and computer science student at the University of Colorado, sues a bulk mailer *after it forged the "From" and "Reply to" headers with his address.* Also see a story from *The Denver Business Journal* about this case.

●Strong sues spammers Bulk E-mail sent under fund's name promoted cybersmut.

●Texans sue to recover damages for Internet spam Lawsuit claims that C.N. Enterprises and Craig Nowak in San Diego used a false return address to send thousands of electronic messages selling information.

- How Do You Handle Spammers? An interview with Internet service provider executives. From Web Week, a Mecklermedia Corp. publication

Policies and laws pertaining to spam

- The Netcheck Commerce Bureau position on unsolicited E-mail The Netcheck Commerce Bureau was "established to promote local business practices worldwide and to increase consumer and corporate confidence in purchasing products and services on the Internet." Find a form here to file a complaint about spam.
- Advertising on Usenet: How To Do It, How Not To Do it Discussion of acceptable and unacceptable ways to advertise. (Posted to news.announce.newusers, news.admin.misc, misc.entrepreneurs, news.admin.net-abuse.misc, news.misc.) Current and Pending legislation related to unsolicited e-mail. See also Existing and Emerging Laws on Junk E-mail, maintained by professor David Sorkin at John Marshall Law School in Chicago.
- Cyberspace Law: Cases: Spamming Maintained by professor David Sorkin at John Marshall Law School in Chicago.

Vox populi

- Point/counterpoint responses to Netcheck's policy. The Netcheck Commerce Bureau was established to promote ethical business practices worldwide and to increase consumer and corporate confidence in purchasing products and services on the Internet.
- Public attitudes Interesting facts about the ownership of personal information and junk mail. A set of survey results posted by The Electronic Privacy Information Center.
- Other Voices on spam Articles by various individuals and Internet providers on spam as well as links to FAQs from different Usenet groups.

Newsgroups

- alt.current-events, net-abuse-spam
- news.admin.net-abuse.announce
- news.admin.net-abuse.bulletins
- news.admin.net-abuse.email
- news.admin.net-abuse.misc
- news.admin.net-abuse.policy
- news. admin.net-abuse.sight in zs
- news.lists.filters
- A moderated, distribution-only list for "junk mail" advertisements. Delivers junk mail to your E-mail box, To subscribe, E-mail junkbot@teletron.com and include "subscribe" in the body of the message.

Spamming proudly

- Cyber Promotions Home Page "Spamford" or Sanford Wallace's bulk E-mail business page.

Not to be confused with . . .

- The official Spam Web site
- Links to unofficial Spam pages

:INDEX: HOME PAGE: NEWS: AUDIO: SEARCH: HELP: TECHCITY ©COMPUTERWORLD

*Id.* at 21–26; Posted August 18, 1997.

### (e) Undated Press Release

THE SOSTRE LAW OFFICE
1920 13th Street, Suite A
Boulder, Colorado 80302
tel: [number]
PRESS RELEASE

Contact:
Shirley Sostre, Esq.
[phone number]

-FOR IMMEDIATE RELEASE-
UNSOLICITED E–MAIL LEADS TO LAWSUIT

On August 29, 1997 local computer student Matthew Seidl filed a landmark case against the Greentree Mortgage company. The 10 page 59 paragraph lawsuit, one of the first of its kind, asserts that Greentree sent thousands of unsolicited e-mail messages to people all across the world using Seidl's Internet address. To the thousands of recipients, it appeared that the unwelcome messages, which are known by the Internet community as "spam", were sent by Mr. Seidl. As a result, Mr. Seidl received thousands of e-mail messages containing angry responses and even threats and insults. More significantly, Mr. Seidl's computer system was so burdened by the volume of traffic resulting from the attack *that it was rendered unusable for a number of days.* Mr. Seidl did his best to

contact Greentree as soon as he found out about the "spam", but to date, Greentree has refused to respond. The case is significant because it raises the issue of whether-"spamming, in particular "spamming" using the address of someone else, is legal. This is an issue which has been debated in the technical arena for several years. As technology has developed new ways of combating "spam", "spammers" have developed new and more intrusive ways of getting their messages across. As a result of abuses such as those committed by Greentree, many states and the U.S. Congress are considering legislation to prevent this type of activity.

Mr. Seidl's case is being handled by local attorneys Shirley Sostre and Philip Dubois, both of whom have extensive experience with the legal issues created by the Internet. Says Sostre "It's one thing for these companies to send unsolicited e-mail. That can be quite annoying. But *when a company deceptively uses a fake address, or worse yet someone else's address in order to "spam"* without any negative repercussions and with total disregard to what might happen to the true owner of the address, then something needs to change."

Mr. Seidl has set up a web page to keep the public informed of the progress of the case and will shortly be posting a full copy of the complaint at the site. For more information see http://www.cs.colorado.edu/-seidl/lawsuit or contact The Sostre Law Office at [phone number], e-mail shirley@sostre.com, or Philip L. Dubois, P.C., at [phone number], e-mail dubois@dubois.com.

-END-

*Id.* at 28. Posted September 1, 1997.

### 2. Privilege for Statements with Some Relation to Judicial Proceeding

[30] Ms. Sostre claims that as an attorney she enjoys the privilege from liability for libel for statements she makes in connection with a case, regardless of the content of those statements. The court must decide as a matter of law whether a communication is privileged. *Kleier Advertising, Inc. v. Premier Pontiac, Inc.,* 921 F.2d 1036, 1042 n. 5 (10th Cir.1990).

The privilege to defamation in connection with a court case is set forth in the Restatement (Second) of Torts § 586 (1977), as follows:

> An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, *if it has some relation to the proceeding.*

*Id.* (underlined emphasis added).

The parties acknowledge in their briefs that Colorado has adopted the privilege as set forth in the Restatement. *See Club Valencia Homeowners Association, Inc. v. Valencia Associates,* 712 P.2d 1024 (Colo. Ct.App.1985). Accordingly, they acknowledge that attorneys hold a privilege to make defamatory statements as long as the statements have "some relation" to the proceedings. They disagree, however, over the interpretation of "if it has some relation to the proceeding." The comment to this section of the Restatement attempts to clarify what is meant by "some relation to the proceeding":

> The privilege stated in this Section is confined to statements made by an attorney while performing his function as such. Therefore it is available only when the defamatory statement has some reference to the subject matter of the proposed or pending litigation, although it need not be strictly relevant to any issue in it. Thus the fact that the defamatory publication is an unwarranted inference from the evidence is not enough to deprive the attorney of his privilege.

Restatement (Second) of Torts § 586 cmt. c (1977).

However, as a note to the 1981 Appendix to the Restatement clarifies, there is the following important limitation to "relation of the statement to the proceeding:" "The absolute privilege does not extend to a press conference." Restatement (Second) of Torts, Appendix § 586, at 517 (1981). Another leading authority states the same limitation as follows: "It is clear, however, the statements given to the newspapers concerning the case are no part of a judicial proceeding,

and are not absolutely privileged." Prosser & Keaton, Law of Torts (5th ed.1984) (citing *Kennedy v. Cannon,* 229 Md. 92, 182 A.2d 54 (Md.Ct.App.1962)). As *Club Valencia* makes clear, Colorado also follows this limitation. In that case the Colorado Court of Appeals held that for the privilege to apply "[A]s well, the maker of the statement *and the recipient* must be involved in and closely connected with the proceedings." 712 P.2d at 1027 (underlined emphasis added)

In *Buckhannon v. U.S. West Communications, Inc.,* 928 P.2d 1331 (Colo.Ct.App.1996), the court held that an investigator's statements made to a party's insurance company during investigation in preparation for trial informing the company that the litigant was not disabled, had accepted kickbacks, had filed a fraudulent tax return, etc., were privileged because:

> [The party's] personal injury suit against U.S. West was based on allegation of occupational disability resulting from the bicycle incident, issues concerning Buckhannon's truthfulness and character did have "some relation" to the proceeding, and were made in the course of U.S. West's preparation for trial. *Club Valencia Homeowners Ass'n.* Thus, we agree that the attorney absolute privilege applies to U.S. West's statements that might otherwise be considered defamatory.

*Buckhannon,* 928 P.2d at 1335.

Thus, in *Buckhannon,* as in *Club Valencia,* the statements had some relation to the proceeding. In *Club Valencia* the alleged defamatory statements were made to members of the homeowners association, who had an interest in the case. In *Buckhannon,* the alleged defamatory statements were made as part of the investigation preparing for trial.[5]

The rule that the privilege does not extend to statements that do not have some relation to the proceeding, such as statements made to the newspapers and at a press conference was followed by the Tenth Circuit in *Kleier Advertising, supra,* 921 F.2d at 1043, a diversity case applying the law of New Mexico. The *Kleier Advertising* court held:

Moreover the Oklahoma Supreme Court recently held that the trial court must not only examine whether the allegedly defamatory statements had some relation to a judicial proceeding but also whether "the circumstances surrounding the communication or publication of the alleged defamatory statement had some relation to the proposed proceeding." *Kirschstein v. Haynes,* 788 P.2d 941, 951 (Okla.1990).

> This inquiry narrows the scope of the privilege much more than the relevancy inquiry and turns to a large extent on determining to whom the publication was made. A measure of protection is, thus, afforded to an alleged victim of defamation for publication to the public at large or to third parties unconnected with the proposed proceeding.

*Id.* (emphasis added) (footnote omitted).

> *Kirschstein* adds that privilege depends not only on the content but the occasion of the communication. *Id.* n. 26 (citing *Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 697–98 (8th Cir.1979)). "The privilege may be lost by unnecessary or unreasonable publication to one for whom the occasion is not privileged. Thus, unnecessary publication to the news media may result in loss of the privilege, as well as publication to those wholly unconnected with the judicial process." *Kirschstein,* 788 P.2d at 951 n. 27.

*Kleier Advertising,* 921 F.2d at 1043.

In *Kleier Advertising,* the statements were made by one of the parties about a lawsuit when an interview with him was published in the newspaper. The court held that "[Defendant's] statements not only were unrelated to any official judicial function but they were directed via the news media to the public, an audience wholly unconnected to the judicial process. Consequently, neither the content nor the occasion of the communications warrants absolute privilege under ... the Restatement." *Id.* at 1044.

An excellent case summarizing the cases and authorities in this area is *Green Acres Trust v. London,* 141 Ariz. 609, 688 P.2d 617

---

5. *See Hawkins v. Harris,* 141 N.J. 207, 661 A.2d 284 (N.J.1995) (examining in detail issue of whether investigator's statements are made in connection with proceeding and therefore covered by the privilege).

(Arizona 1984). In *Green Acres*, the court held there was no privilege where the defendant attorneys made statements to a reporter in an informal meeting or "press conference" before they filed a lawsuit.

> We believe that both content and manner of extra-judicial communications must bear "some relation to the proceeding." The requirements of *Asay [v. Hallmark Cards, Inc.*, 594 F.2d 692 (8th Cir.1979)], that the recipient of the extra-judicial communication have some relationship to the proposed or pending judicial proceeding for the occasion to be privileged is sound. *See Sriberg v. Raymond*, 544 F.2d 15 (1st Cir. 1976); *Bradley v. Hartford Accident & Indemnity Co.[*, 30 Cal.App.3d 818, 106 Cal.Rptr. 718 (1973)][6], *supra; Troutman v. Erlandson*, [286 Or. 3,] 593 P.2d 793, 795 (1979) (requires recipient to have "close or direct" relationship to the proceedings). Ordinarily the media will lack such a connection to a judicial proceeding. *Cf. KPNX Broadcasting Co. v. Superior Court*, 139 Ariz. 246, 678 P.2d 431 (1984) (media became intervenors).
>
> In this case, the recipient of the communications, the newspaper reporter, had no relation to the proposed class action. The reporter played no role in the actual litigation other than that of a concerned observer. Since the reporter lacked a sufficient connection to the proposed proceedings, public policy would be ill served if we immunized the communications made to the reporter by the lawyer defendants. The press conference simply did not enhance the judicial function and no privileged occasion arose. Accordingly, the lawyer defendants were not absolutely privileged to publish the oral and written communications to the newspaper reporter.

*Green Acres Trust*, 688 P.2d at 622–23.

### 3. No Attorney Privilege for Statements of Fact Made to General Public Via Internet

■ These communications were made for the express purpose of publicizing the

lawsuit. Their dissemination via the Internet created a world-wide audience. There is no evidence that any of the viewers had any connection to the proceeding, except as potentially concerned observers. Thus, the audience than Ms. Sostre and Mr. Seidl chose to publicize their allegations is even more removed from the proceeding that the newspaper reporters involved in the *Kleier Advertising* and *Green Acres Trust* cases because the audience chosen was wholly unconnected to the judicial process.

Sostre cites public policy considerations in support of her claim for privilege. She states an attorney has a duty to represent his client zealously "... seeking any lawful objective through legally permissible means and that in doing so the attorney must be free to speak and write freely without the restraint of fear of a possible defamation action." *Hawkins v. Harris*, supra, 661 A.2d at 288. The court also notes, as was stated in *Club Valencia:* "All doubt should be resolved in favor of its relevancy or pertinency. No strained or close construction will be indulged to exempt a case from the protection of the privilege." 712 P.2d at 1027.

However, as stated in the leading treatises and in the majority of cases, the privilege does not apply to statements, in the form of press releases or otherwise, made to the news media or others who have no connection with the case except as interested observers. As was stated in *Kennedy, supra*, "An attorney who wishes to litigate his case in the press will do so at his own risk. We hold that [the attorney] had no absolute privilege in regard to the statement made by him to the newspaper." Similarly, in this case, an attorney who wishes to litigate her case in the press and via the Internet does so at her own risk. There is no absolute privilege under Colorado law for statements by an attorney or by a party made to the press or gratuitous statements posted on the Internet for the purpose of publicizing the case to persons who have no connection to the proceeding except as potentially interested observers.

---

**6.** The requirement in the much-cited *Bradley* case that the communication be made for the purpose of promoting justice in order to be privileged has been rejected in subsequent cases. *See*

*Doctors' Co. Ins. Services v. Superior Court*, 225 Cal.App.3d 1284, 275 Cal.Rptr. 674 (Cal.App. 1990). However, the *Bradley* case appears to otherwise remain viable.

The court will next examine if the statements were privileged expressions of opinion under the First Amendment.

### 4. First Amendment Protection for Statements of Opinion

Colorado law regarding libel, a form of defamation, is set forth in the case *Keohane v. Stewart,* 882 P.2d 1293 (Colo.1994). *Keohane* involved a judge who alleged he was accused of accepting a bribe in a controversial case. In response he brought claims of libel and defamation against the newspaper, a writer of letters to the editor, and city counsel members. The court in *Keohane* examined whether the statements were actionable, or were instead, mere statements of opinion which are protected under the First Amendment.

This court in *Burns [v. McGraw–Hill Broadcasting Co.,* 659 P.2d 1351 (Colo. 1983) ] and the United Supreme Court in *Milkovich [v. Lorain Journal Co.,]* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) , however, specifically noted that there was no "wholesale defamation exemption for anything that might be labeled 'opinion.' " *Milkovich,* 497 U.S. at 18, 110 S.Ct. 2695; *Burns,* 659 P.2d at 1358 (noting that *Gertz* did not immunize all forms of opinion). The Court in *Milkovich* reasoned that in order to insure "uninhibited, robust, and wide-open" debate on matters of public concern, "a statement of opinion relating to matters of public concern which does not contain a provably false connotation," or which "cannot 'reasonably [be] interpreted as stating actual facts' about an individual," continues to receive full constitutional protection. *Milkovich,* 497 U.S. at 20[, 110 S.Ct. 2695]. [additional citations omitted].

*Milkovich* and *Burns* thus provide the necessary framework to determine if a statement is protected. This framework involves two inquiries. The first inquiry is whether the statement is "sufficiently factual to be susceptible of being proved true or false." *Milkovich,* 497 U.S. at 21[, 110 S.Ct. 2695]. The second inquiry is whether reasonable people would conclude that the assertion is one of fact. *Id.* The factors relevant to the second inquiry are: (1) how the assertion is phrased; (2) the con-text of the entire statement; and (3) the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed. *Burns,* 659 P.2d at 1360; *see Milkovich,* 497 U.S. at 20[, 110 S.Ct. 2695] (holding that loose, figurative, or hyperbolic language may indicate that the statement could not reasonably be interpreted as a statement of fact); *Falwell,* 485 U.S. at 50[, 108 S.Ct. 876] (noting that the statement as a whole as well as the broader social context must be considered); *White v. Fraternal Order of Police,* 909 F.2d 512, 516 (D.C.Cir.1990) (stating a court must examine the entire context of a publication and the dramatic intonations of the speaker). The factors are essential to insure that society's desire to protect speech and robust public debate does not create a license to commit character assassination. *Keohane,* 882 P.2d at 1298–99 (citations partially omitted and footnotes omitted).

Examining the statements in *Keohane* within this framework the court noted that several of the statements appeared in letters to the editor on the editorial page, "a traditional forum for debate, where intemperate and highly biased opinions are frequently presented and, absent credentials which make the author particularly credible, often time should not be taken at face value." 882 P.2d at 1301.

 Examining the first communication, the letter from Ms. Sostre to Greentree, the statements in the letter are part of what is clearly a demand letter. Although the letter contains inflammatory language, a person reading it would understand it is a demand letter from an attorney on behalf of a client and represents the attorney's contentions on behalf of the client. Reasonable persons would understand the letter represents the opening salvo of what became litigation by an interested party and that the letter is that party's position, or opinion. Reasonable persons would understand that as the first step in the litigation process, the party's position is stated in colorful and exaggerated language. The letter's statements that the use of the domain name was for "fraudulent pur-

poses" and was "reckless, willful and wanton, or at best, negligent" are, in the context of the entire demand letter, statements of opinion, as shown by the use of rhetorical hyperbole. As in *Keohane,* the letter is couched in terms of accusations and speculation. For example, the use of the word "may" in connection with violations of specific statutes evidence speculation and conjecture. Similarly, the letter's statement that "we are continuing our investigation" shows speculation and conjecture. It further supports interpretation of the letter as an opinion that the public would understand to be one step in the litigation process.

In *NBC Subsidiary (KCNC–TV), Inc. v. The Living Will Center,* 879 P.2d 6 (Colo. 1994), a defamation case decided the same day as *Keohane,* the Colorado Supreme Court held that statements such as "I think its a scam" and "they will send in $29.95 and what they get back is they've been totally taken—is what it amounts to—totally taken" were held to be opinion and not statements of fact when viewed in the context of the entire broadcast. 879 P.2d at 13–14.

> In contrast to the court of appeals conclusion, we hold that the gist of the two broadcasts does not contain or imply a verifiable assertion of fact nor could it reasonably be understood as an assertion of actual fact. Thus, we conclude that the gist of the two broadcasts is constitutionally privileged. Accordingly, we need not address whether the gist of those broadcasts is true.

*Id.* at 14.

Similarly, in this case read in context, the gist of the demand letter does not contain or imply a verifiable assertion of fact nor could it reasonably be understood as an assertion of actual fact.

 The second set of statements are contained in the September 1, 1997, Press Release and use the terms "e-mail forgery" and "forged" headers. As the other articles make clear, "forged" in this context is a colloquial term that describes what the bulk e-mailer did in this case—he used a return path or header other than his own for the e-mail. Reading this paragraph in its context, reasonable persons would not conclude that there was commission of "forgery" in the

sense of the crime of forgery, but rather forgery in the sense of the colloquial term— use of a fictitious header. Accordingly, this paragraph is a statement of opinion.

 In the Denver Business Journal article used as a press release the statements by Ms. Sostre are clearly labeled as her opinion. Her opinion that it was impossible for the headers to be used accidentally is, in fact correct because someone had to place the name on the e-mail advertisements. It is undisputed in this case that Mr. Van Kueren did in fact place the domain name on the advertisements when they were sent out. Ms. Sostre's statement about what claims might be brought is also clearly labeled as a possibility. Viewed in the context of the entire article, reasonable persons would have understood her statements to be her opinion, including her legal opinion on possible causes of action. Taken as a whole, these statements are opinion protected by the First Amendment.

 In the Computerworld article used as a press release, the statements refer to Greentree and an unnamed bulk mailer. The statement that the bulk mailer "forged" the headers is as discussed above, a use of the colorful colloquial term to describe the practice of not using the sender's own e-mail address in the header. Reasonable persons would not understand it is an assertion of fact that Greentree committed the crime of forgery. Further, in the context of the entire article, reasonable persons would not understand the statements as assertions of fact that Greentree, as opposed to the unnamed bulk e-mailer, forged the headers.

The statement set forth in the undated press release, *supra,* regarding "deceptively using... someone else's address" is not an assertion of fact and reasonable persons would understand the statement as an assertion of fact that Greentree had "deceptively use[d]" someone else's, namely Mr. Seidl's, address.

Thus, the statements at issue are statements of opinion. As such, the expression of those opinions including the publication to parties unrelated to the lawsuit is protected by the First Amendment. Accordingly, Mr.

Seidl and Ms. Sostre are entitled to summary judgment dismissing these claims.

### 5. Libelous Per Se

■■■■ Further, even if the statements were not statements of opinion immunized under the First Amendment, Mr. Seidl and Ms. Sostre would have been entitled to summary judgment on all but one of the statements because the others are not libelous per se. Unlike the examination of whether a statement is opinion protected under the First Amendment, to determine if a statement is libelous per se under Colorado law, the court examines the statements on their face, exclusive of an inference or context.

> A published statement or picture, or both, is libelous per se if it is defamatory on its face, *Bernstein v. Dun & Bradstreet, Inc.,* 149 Colo. 150, 368 P.2d 780 (1962); *Knapp v. Post Printing & Publishing Co.,* 111 Colo. 492, 144 P.2d 981 (1943), such that no extrinsic evidence is necessary to show either its defamatory nature or that it is of and concerning the plaintiff. *Lininger v. Knight,* 123 Colo. 213, 226 P.2d 809 (1951); *Inter–State Detective Bureau, Inc. v. Denver Post, Inc.,* 29 Colo.App. 313, 484 P.2d 131 (1971).

*Lind v. O'Reilly,* 636 P.2d 1319 (Colo.Ct.App. 1981) (citations partially omitted).

> In determining whether the broadcast here was libel per se, the court was required to interpret the broadcast alone, without the aid of inducements, colloquialisms, innuendos, and explanatory circumstances in order to establish its defamatory meaning. To be libelous per se, the broadcast must contain a defamatory meaning specifically directed at the person claiming injury, which must, on its face, and without the aid of intrinsic proof, be unmistakably recognized as injurious. *See Inter–State Detective Bureau v. Denver Post, Inc.,* [29 Colo. App. 313,] 484 P.2d 131 (1971).

> In this case the words and pictures were not injurious to plaintiff. They were in fact true statements and depictions. There was nothing about the words of the spoken broadcast and the video broadcast of the plaintiff's sign and building that was either untrue or defamatory. *See Reddick v. Craig,* 719 P.2d 340 (Colo.App.1985). Plaintiff's contention that the inferences

created by the video broadcast were injurious to it is the classical depiction of defamation per quod, not defamation per se. *McCammon & Associates, Inc. v. McGraw– Hill Broadcasting Company, Inc.,* 716 P.2d 490, 492 (Colo.Ct.App.1986).

In this case, the statements are, with one exception, not even close to being libelous per se. They do not charge Greentree falsely with a crime. *See Walker v. Associated Press,* 160 Colo. 361, 417 P.2d 486 (1966).

■■■■ The only possible exception is in the demand letter. The statement is that "Therefore, your use of his name constitutes misappropriation for fraudulent purposes." Read out of context of the entire letter, the sentence could be read as falsely charging Greentree with having committed a crime. However, as noted above, read in the context of the entire letter, the statement is a statement of opinion and its expression is therefore protected by the First Amendment.

### 6. Access to Courts

Counterclaim defendants Sostre and Seidl also contend that all of Greentree's counterclaims must be dismissed because Greentree filed the counterclaims in retaliation for their having exercised their rights under the First Amendment of the U.S. Constitution to access to the courts to petition for redress of grievances. Citing *Protect Our Mountain Environment, Inc. v. District Court,* 677 P.2d 1361, 1369 (Colo.1984). The court has granted summary judgment in favor of Ms. Sostre and Mr. Seidl for the reasons set forth above, and therefore need not reach this claim.

### VII. Cross–Claim Against Van Kueren

It appears to the court that Greentree's third-party claims against Mr. Van Kueren for indemnity and contribution may have been resolved by the granting of Greentree's Motion for Summary Judgment on all of Mr. Seidl's claim. If this is incorrect, Greentree should inform the court of the status of the third-party complaint.

### VIII. Conclusion

According to the undisputed facts, Greentree took advantage of an available, legal, but

controversial vehicle for advertising its businesses by hiring someone to send unsolicited advertisements by e-mail, with unintended consequences to Mr. Seidl. Mr. Seidl, a private citizen with an ax to grind about the political/social issue of spamming, transformed the public debate over this issue into a legal dispute with Greentree, an admitted spammer. The lawsuit was for the purpose of publicizing adverse consequences to companies which engaged in spamming. Mr. Seidl and his lawyer, Ms. Sostre attempted, unsuccessfully, to develop a legal theory under which an advertiser could be made to suffer financially for the practice of spamming. It appears to this court that such efforts at changing the law regarding spamming would be more effectively addressed in the legislative arena.

Finally, the court notes that this case does not extend any new privilege to communications via the Internet. As discussed above, the court declines to extend the privilege for statements made in connection with a legal proceeding to a party's or a lawyer's statements made to a world-wide audience via the Internet. The court cautions that although the statements in this case are, on specific circumstances before the court on summary judgment, protected opinion under the First Amendment, the court's decision today is not a blanket grant of such immunity. Communication via the Internet is not granted any special protection beyond that otherwise afforded to expression of opinion under Colorado law.

### IX. Order

It is therefore

ORDERED defendant Greentree Mortgage Company's Motion for Summary Judgment is GRANTED and judgment will be entered in favor of defendant Greentree Mortgage Company and against plaintiff on all of his claims. It is further

ORDERED that counterclaim defendant Shirley Sostre's Motion to Dismiss is construed as a motion under Fed.R.Civ.P. 56. It is further

ORDERED that counterclaim defendant Shirley Sostre's Motion for Summary Judgment is GRANTED and judgment will be entered in favor of counterclaim defendant Shirley Sostre on Greentree Mortgage Company's counterclaims. It is further

ORDERED that counterclaim defendant Matthew Seidl's Motion for Summary Judgment is **DENIED** on his claim that Mark Van Kueren was the agent of Greentree Mortgage Company and is otherwise **GRANTED** for all of Greentree Mortgage Company's counterclaims. It is further

ORDERED that Greentree Mortgage Company shall file a notice of the status of its third party claims against Mark Van Keuren within ten days of the entry of this order.