LA CASA NINO, INC., a Colorado corporation; Donald Goldman, Max Baer, and La Pompe de Ville, Inc., a Colorado corporation, Petitioners,

v.

PLAZA ESTEBAN, a general partnership, Respondent.

No. 87SC160.

Supreme Court of Colorado, En Banc.

Oct. 11, 1988.

Zerobnick & Sather, P.C., Martin Zerobnick, Gwen Jarahian Young, Joseph A. Margoshes, Popham, Haik, Schnobrich & Kaufman, Richard G. Sander, Denver, for petitioners.

Inman, Erickson & Flynn, P.C., Richard P. Brentlinger, Denver, for respondent.

QUINN, Chief Justice.

This case raises the question whether a lessee is entitled to setoff against arrearages owed to the lessor the amount of an "entry premium" which the lessor received from a subsequent lessee as consideration for the lessor's reletting of the premises to

the subsequent lessee following the original lessee's default but before the expiration of the term of the original lessee's lease. In *Plaza Esteban v. La Casa Nino, Inc.*, 738 P.2d 410 (Colo.App.1987), the court of appeals held that the entry premium could not be set off against the arrearages owed by the prior lessee. We reverse the judgment and remand the case for entry of a new judgment.

## I.

Plaza Esteban, a general partnership, is the owner of real property which is used as a shopping center in Denver. On July 1, 1974, Plaza Esteban (lessor) entered into a ten year commercial lease with La Casa Nino, Inc. (La Casa Nino) for 5,402 square feet of improved premises in the shopping center. The lease provided that the premises would be used to operate a restaurant-bar and obligated the lessee to pay a minimum monthly rent of $1,845.68, plus increased taxes and insurance costs, and a monthly maintenance fee of $698.33.[1] Donald Goldman and Max Baer, who are principals in La Casa Nino, personally guaranteed the lessee's performance of the lease obligations. In the event of the lessee's default in rental payments, the lease granted the lessor the option to cancel the lease and expressly stated that such cancellation would not operate as a waiver or satisfaction of any claim or demand arising out of the lessee's violation of the lease. The lease authorized the lessor, upon the lessee's default, to relet the premises, without, however, relieving the lessee of its obligation to pay any deficiency that might arise by reason of such reletting. The lease further provided that any loss or damage suffered by the lessor by reason of the lessee's termination of the lease or as the result of any reletting of the premises shall include "the minimum guaranteed rental herein provided for the period from the date of an event of default until the end of the term of this lease, plus a sum equal to the average annual percentage rental required to be paid herein by Lessee

during the twelve-month period immediately preceding the date of such termination or reletting."

La Casa Nino opened a restaurant and a bar on the premises, but the business soon failed. Shortly thereafter La Casa Nino sold its business and, with the lessor's consent, entered into a sublease with a corporate entity which subsequently defaulted on its obligations. La Casa Nino retook possession of the premises and, again with the lessor's consent, subleased the premises to another corporate entity which similarly defaulted on its sublease obligations.

La Casa Nino was experiencing serious financial difficulties throughout this time, and in 1979 all interested parties agreed that La Pompe deVille, Inc. (La Pompe deVille), a corporation owned by the guarantors, could be substituted as successor in interest to La Casa Nino's rights under the lease and that the guarantors would continue to guarantee the lessee's performance. La Pompe deVille operated the restaurant and bar on the premises until 1982, when it assigned its rights under the lease to another corporation, which ultimately failed and defaulted on its obligations under the lease. La Pompe deVille did not secure another tenant for the leased premises, nor did it make any of its monthly payments to the lessor after June 1, 1983.

On November 21, 1983, approximately six months before the expiration of the ten year lease term in the original lease, the lessor leased the premises to JaJal, Inc. (JaJal) for a two year term commencing on March 1, 1984. This subsequent lease obligated JaJal to pay monthly rent of $3,600 the first year and $3,800 the second year, plus a fixed maintenance fee of $225 per month, and contained options to renew for additional terms at increased rental rates. By separate agreement, JaJal agreed to pay the lessor $130,000 as an "entry premium" for the lease.

On December 1, 1983, the lessor made a demand upon Goldman and Baer, the guar-

---

1. The lease also required the lessee to pay a percentage of gross sales which exceeded by a certain percentage the minimum monthly rental

payment, but this provision never became effective due to the unsuccessful operation of the business.

antors of the lessee's performance, for $37,878.21 in arrearages under the original lease. The guarantors did not respond to the demand, and the lessor filed this suit against La Casa Nino and La Pompe de-Ville (hereinafter collectively referred to as the original lessee),[2] and the guarantors. The lessor alleged that the original lessee and the guarantors were in default of the lease and sought past due rent from the time of default, June 1, 1983, until November 1, 1983, when the subsequent lease with JaJal was executed. The original lessee and the guarantors denied any liability under the lease and alleged that the lessor had received rent arrearages and other moneys as the result of its subsequent lease with JaJal.[3]

The case was tried to the court in June 1985. The lessor conceded that the original lessee and the guarantors were entitled to set off against any amounts due and owing under the original lease the difference between the monthly payments received from JaJal from March to May 1984 ($3,600 monthly rent plus $225 maintenance fee) and the monthly payment it should have received from the original lessee during the same period of time ($2,158.69 monthly rent plus $698.33 maintenance fee).[4] The original lessee and the guarantors contended, however, that they were also entitled to set off the $130,000 "entry premium" received by the lessor from JaJal as consideration for the subsequent lease executed on November 21, 1983, prior to the expiration of the original lease. The trial court found that the original lessee and the guarantors

were in default of their obligations under the lease and owed the lessor past due rent, maintenance fees, and other expenses amounting to $19,341.04. Against this amount the trial court set off $4,749.62, which represented the security deposit of $1,845.68 retained by the lessor and the additional amount of $2,903.94, which was the difference between the monthly payments received by the lessor under its subsequent lease with JaJal and the amount which the lessor would have received from the original lessee if the original lessee had not defaulted on its lease. The trial court, however, refused to allow a setoff for the $130,000 "entry premium" received by the lessor, ruling that the right "to charge an entry premium is an exclusive right of the party in lawful possession of the premises." The trial court accordingly entered judgment in favor of the lessor for $14,591.42.

The original lessee and the guarantors appealed to the court of appeals, which in a split decision affirmed the judgment. Citing this court's decision in *Schneiker v. Gordon*, 732 P.2d 603 (Colo.1987), the court of appeals characterized the entry premium as "independent consideration for an option or contract for a new lease," rather than rent due and owing under the original lease, and held that the entry premium could "not be applied in mitigation of damages under the prior lease." *Plaza Esteban*, 738 P.2d at 412. We thereafter granted the petition of the original lessee and

2. We refer in the opinion to both La Casa Nino and La Pompe deVille as the "original lessee" because La Pompe deVille succeeded to the interests of La Casa Nino under the original lease.

3. The lessor initially sued La Casa Nino and the guarantors, but La Pompe deVille was later permitted to intervene and asserted a claim against Plaza Esteban and its general partner, Steve Roberts, for declaratory relief with respect to its rights under the lease and for damages for intentional interference with prospective contractual relations. After La Pompe deVille filed its claims against the lessor and Roberts, the lessor was permitted to amend its complaint to state a claim against La Pompe deVille as successor in interest to La Casa Nino for breach of the lease agreement and for arrearages. The trial court

rejected La Pompe deVille's claim against the lessor and Roberts, and, as we point out in the text, ruled in favor of the lessor on its claim against La Casa Nino, La Pompe deVille and the guarantors, for breach of the original lease agreement. Although there is some reference in the briefs to the fact that La Casa Nino and La Pompe deVille were involved in bankruptcy proceedings during the term of the lease, the record does not reflect the nature of those proceedings and no issue has been raised as to their amenability to judgment in this case.

4. Although the original lease provided for a monthly rental payment of $1,845.68, it was increased to $2,158.69 in order to reflect increased taxes and insurance costs paid by the lessor.

the guarantors to review the propriety of the court of appeals' decision.

In urging reversal of the court of appeals' decision, the original lessee and the guarantors claim that they are entitled to a setoff for the entry premium received by the lessor from the subsequent lessee upon reletting the premises before the expiration of the term of the original lease. This claim, in our view, finds support in our decision in *Schneiker v. Gordon,* 732 P.2d 603, and reversal of the judgment is accordingly required.

## II.

We acknowledged in *Schneiker* the dual nature of a commercial lease as both a contract and a conveyance, but recognized the necessity of applying contract principles to determine the correct measure of damages due to a lessor upon default by a lessee. 732 P.2d at 608–09. We described a commercial lease as "predominantly an exchange of promises," and characterized a covenant to pay rent as representing "one such promise." *Id.* at 610. Drawing on the general principle that the goal of contract law is to place a nondefaulting party in the position it would have occupied if no default had occurred, *see Taylor v. Colorado State Bank,* 165 Colo. 576, 580, 440 P.2d 772, 774 (1968), and relying also on the contract principle of "avoidable consequences" or "duty to mitigate," we held that a lessee's default under a commercial lease entitled the lessor to an amount of damages which would place the lessor in the position the lessor would have occupied if the lessee had not defaulted, taking into account the lessor's duty to mitigate. *Schneiker,* 732 P.2d at 612. The lessor's duty to mitigate, we further observed, finds its source in the principle that economic waste resulting from a default should be avoided whenever practicable to do so. *Id.* at 610.

Application of the principle of "avoidable consequences" or "duty to mitigate" in the context of a lessee's default on a commercial lease prior to the expiration of the term of the lease not only effectuates the goal of prohibiting the lessor "from passively suffering preventable economic loss" but also serves to encourage "the productive use of land" and "to decrease the likelihood of physical damage to property," without in any way impairing the lessor's right to receive the benefit of the bargain in an action for contract damages resulting from the lessee's default or repudiation of the lease agreement. *Id.* at 611. Under our decision in *Schneiker,* therefore, a lessor may receive from a defaulting lessee an award of damages that is commensurate with the benefit of the bargain contemplated in the lease agreement, but any such award must take into consideration any monetary benefit received by the lessor as consideration for reletting the premises, pursuant to the lessor's duty to mitigate damages. *See Dalamagas v. Fazzina,* 36 Conn.Supp. 523, 414 A.2d 494 (1979) (where new tenant pays a higher rent than defaulting tenant was obliged to pay under terms of original lease, landlord must apply the excess against other recoverable damages, since "law of contractual damages generally seeks to put the injured party in the same position he would have been in had the contract been performed"); *Truitt v. Evangel Temple, Inc.,* 486 A.2d 1169 (D.C. 1984) (affirming trial court ruling that rent received by landlord from a substitute tenant exceeded the amount of rent required from defaulting lessee under the original lease, with the result that landlord suffered no damage and was not entitled to recovery against original defaulting tenant who had abandoned premises); *Wanderer v. Plainfield Carton Corp.,* 40 Ill.App.3d 552, 351 N.E.2d 630 (1976) (recognizing and applying rule that "lessee who breaches a lease is entitled to a rent credit for any proceeds gained by the landlord from reletting during the period of the original lease term").

## III.

The court of appeals in the instant case interpreted *Schneiker* to mean that only proceeds received in the form of rent could be applied in mitigation of a lessor's damages. This interpretation of *Schneiker* is erroneous.

We pointed out in *Schneiker* that if a lessor, as a result of the lessee's default, is able to avoid costs by not having to perform lease obligations, those savings must be deducted from the amount of damages ultimately awarded to the lessor as the result of the lessee's default. *Id.* at 612. It follows by a parity of reasoning that if a lessor gains a monetary benefit as the result of reletting the premises before the expiration date of the defaulting lessee's lease, the amount of that monetary benefit should also be set off against the amount of damages assessed against the defaulting lessee to place the lessor in the position it would have occupied had no default occurred.

The fact that the monetary benefit to the lessor is in the form of an "entry premium" paid by a subsequent lessee, rather than increased rent, should have no legal significance to the proper measure of damages as long as the "entry premium" is paid to the lessor as consideration for reletting the premises prior to the expiration date of the defaulting lessee's lease. A rule prohibiting a lessee from offsetting an "entry premium" simply because the "entry premium" is not in the form of rent or other similar monetary obligation incorporated in the original lease would place the lessor in a financially more advantageous position than the lessor would have occupied if the defaulting lessee had fully performed its obligations under the prior lease. Furthermore, such a rule would fly directly in the face of the principle that a party seeking recovery under a contract has a duty to mitigate damages. *E.g., Stanspec Corp. v. Jelco, Inc.,* 464 F.2d 1184, 1187 (10th Cir. 1972); *Tull v. Gundersons, Inc.,* 709 P.2d 940, 946 (Colo.1985); *Brenaman v. Willis,* 136 Colo. 53, 56–57, 314 P.2d 691, 692–93 (1957). As Judge Tursi remarked in his dissent to the court of appeals' decision in this case, the issue is not whether a lessor may charge an "entry premium," but whether, having availed itself of the opportunity to relet the premises, the monies received by the lessor upon reletting must be applied in mitigation of damages. *Plaza Esteban v. La Casa Nino, Inc.,* 738 P.2d at 413 (Tursi, J., dissenting). A rule prohibiting an offset of an "entry premium" in mitigation of damages would elevate form over substance and impermissibly allow a lessor to reap a windfall from the lessee's default.

In urging us to affirm the decision of the court of appeals, the lessor basically raises two arguments, each of which we find unavailing. Emphasizing the fact that it contracted with JaJal for the "entry premium" in a document separate from the lease itself, the lessor initially argues that the "entry premium" was an independent obligation unrelated to the JaJal lease and should not be applied to reduce the damages resulting from the original lessee's default on the original lease. Notwithstanding that two separate agreements were entered into between the lessor and JaJal, it is undisputed that the lessor received the monetary benefit of the "entry premium" as consideration for reletting the premises prior to the expiration of the original lease, and that such monetary benefit placed the lessor in a far better position than it would have occupied if the original lessee had not defaulted. Under these circumstances, offsetting such benefit against arrearages owed by the original lessee places the lessor in the same position it would have occupied if no default had occurred at all.

The lessor also contends that since it would not have been required to set off the "entry premium" payment if it had deferred the "entry premium" agreement until June 1, 1984, the expiration date of the term of the original lease, it should not be required to do so now merely because the "entry premium" was received prior to the expiration of the original lease. What this argument overlooks, however, is that the lessor's effort in obtaining another lessee was no more than what was required of the lessor under the avoidable consequences doctrine, which requires a commercial lessor to exercise all reasonable efforts to mitigate its damages following a lessee's default. *Schneiker,* 732 P.2d at 610–11. If the lessor had not entered into the lease with JaJal when it did, but had waited until after the expiration of the original lease on

June 1, 1984, it could hardly be said that the lessor should be entitled to recover for damages that could easily have been avoided through reasonable efforts to relet the premises. *See Mar–Son, Inc. v. Terwaho Enterprises, Inc.*, 259 N.W.2d 289 (N.D.1977); 5 A. Corbin, *Corbin on Contracts* § 1039 (1964).

We conclude that a defaulting lessee may set off against arrearages owed a lessor an "entry premium" paid to the lessor by a subsequent lessee as consideration for reletting the premises following the original lessee's default but before the expiration of the term of the original lease. We accordingly reverse the judgment of the court of appeals and remand the case to that court with directions to return the case to the trial court for the entry of judgment consistent with the views herein expressed.

LOHR, J., does not participate.