IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

PREMIER CONSULTING AND MANAGEMENT
SOLUTIONS, LLC, et al., *Plaintiffs/Appellants/Cross-Appellees*,

*v.*

PEACE RELEAF CENTER I, et al., *Defendants/Appellees/Cross-Appellants*.

No. 1 CA-CV 21-0754
FILED 2-5-2024

Appeal from the Superior Court in Maricopa County
No. CV2017-009033
The Honorable James D. Smith, Judge (Retired)

**AFFIRMED IN PART; VACATED IN PART; REMANDED**

COUNSEL

Fennemore Craig, P.C., Phoenix
By Timothy J. Berg
*Counsel for Plaintiffs/Appellants/Cross-Appellees*

Osborn Maledon, P.A., Phoenix
By Eric M. Fraser
*Counsel for Defendants/Appellees/Cross-Appellants*

**OPINION**

Presiding Judge Maria Elena Cruz delivered the opinion of the Court, in which Judge Angela K. Paton and Judge Kent E. Cattani joined.

**C R U Z**, Judge:

¶1 Premier Consulting and Management Solutions, LLC ("Premier"), JJSM Real Estate Fund, LLC ("JJSM") and JJSM Equipment Fund, LLC ("JJSM Equipment") appeal the superior court's orders (1) partially granting Peace Releaf Center I, d/b/a Patient Alternative Relief Center ("PARC")'s motion for judgment as a matter of law and vacating the jury's award of $1,377,320 in damages in favor of JJSM, (2) denying Premier's motion for a new trial, (3) partially granting Yurikino Downing's motion for judgment as a matter of law, and (4) reducing their attorneys' fees awards. PARC and Downing cross-appeal the superior court's denial of their motions for judgment as a matter of law on multiple counts and its judgment awarding JJSM nominal damages. For the following reasons, we reverse the superior court's post-trial ruling setting aside the jury's damages award in favor of JJSM, vacate the court's attorneys' fees award, remand to the superior court for a redetermination of attorneys' fees, and otherwise affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2 PARC was a non-profit corporation licensed by the Arizona Department of Health Services ("ADHS") to open a medical marijuana dispensary ("the dispensary"). As a non-profit entity, PARC was governed by a board of directors and did not have an owner. PARC opened its dispensary in Phoenix in 2014.

¶3 PARC's license allowed it to have a marijuana cultivation facility, and its founder and executive director, Jeff Schaeffer, sought to establish a cultivation facility ("the facility") in Phoenix to supply the dispensary. He, along with several investors, formed three for-profit companies—Premier, JJSM, and JJSM Equipment—to own, equip, and operate the facility. PARC, as the dispensary license holder, would own and sell the marijuana produced in the facility. Ninety percent of the gross sales revenues for marijuana product produced at the facility and sold by PARC was to be paid to Premier as a management fee.

¶4 By 2015, JJSM had purchased and begun construction on the facility. Construction costs caused Schaeffer and his co-investors to seek additional investors, and in late 2015 and early 2016, investors Rick Merel and Barry Missner, through their investment company New Leaf Investments AZ, bought out two original investors and invested millions of dollars in Premier, JJSM, and JJSM Equipment. Schaeffer retained an ownership interest in the three companies.

2

¶5         In December 2015 and January 2016, PARC entered into three contracts with JJSM, JJSM Equipment, and Premier, including a lease agreement for the facility with JJSM as the lessor and PARC as the lessee ("the lease"), an equipment rental agreement ("equipment lease") with JJSM Equipment, and a cultivation management agreement ("cultivation agreement") with Premier.

¶6         The lease began January 1, 2016, and was to expire December 31, 2025, "unless sooner terminated or renewed as provided" in the lease. Under the lease, PARC agreed to pay JJSM monthly base rent of $33,333, with a three percent increase every year during the lease term.  Monthly rent would be abated until after the "first harvest of cannabis plants." Whether a first harvest had occurred "shall be determined in the sole but reasonable discretion of Landlord (JJSM)."  Similarly, under the equipment lease, PARC would not need to pay a monthly rental fee to JJSM Equipment until after the "first harvest of cannabis plants" as "determined in the sole but reasonable discretion of Lessor (JJSM Equipment)."

¶7         ADHS inspected the cultivation facility, approved its operation, and issued an approval to operate ("ATO").  Premier began growing marijuana but had difficulty producing usable marijuana flower. It struggled with diseased plants, personnel problems, and equipment failures.  However, in December 2016, Schaeffer sent Merel and Missner an email depicting fully bloomed marijuana plants in several of the facility's grow rooms.  Premier produced less than ten percent of the 900 pounds of marijuana PARC sold in 2017.

¶8         In April 2017, PARC's board of directors held a special board meeting, wherein several of PARC's board members resigned and were replaced by new board members, including Downing, who was made president of PARC.

¶9         PARC never paid rent to JJSM or JJSM Equipment.  In February 2017, Missner emailed Schaeffer to notify PARC that he and Merel had determined that a first harvest had occurred, based on Schaeffer's December 2016 email.  In May 2017, JJSM notified PARC in writing that it was in default of the lease because "[t]he first harvest at the Premises occurred on December 18, 2016" and PARC had not yet paid any rent or a security deposit, but it did not give notice of termination of the lease or of the right to possession.  The May 2017 letter gave PARC an opportunity to cure the default.  Also in May 2017, Premier sent a letter to PARC asserting it was in breach of the cultivation agreement.  PARC did not cure the lease default and responded by letter in June 2017 that it was terminating the lease, the equipment lease, and the cultivation agreement.

**¶10** In June 2017, Premier, JJSM, and JJSM Equipment sued PARC and Downing, among others,[1] alleging claims for breach of their respective agreements and the implied covenant of good faith and fair dealing against PARC, and claims for tortious interference with those agreements against Downing. PARC counterclaimed for declaratory relief/recission, breach of contract, and breach of the implied covenant of good faith and fair dealing.

**¶11** In August 2017, PARC requested to inspect the facility, and Premier denied it access. In October 2017, PARC requested ADHS to decertify the facility, and ADHS cancelled the facility's ATO, resulting in the facility's closure and the destruction of its inventory.

**¶12** In April 2020, JJSM entered into a lease with a new tenant for the facility with a lease term commencing April 1, 2020 and ending July 31, 2035, with the obligation to pay rent commencing on August 1, 2020, for a rent amount that greatly exceeded PARC's obligations under the lease.

**¶13** In June 2020, PARC moved in limine to exclude any evidence or testimony about JJSM's damages, arguing the new lease's rent fully offset any of PARC's alleged liability to JJSM under the lease. The superior court denied the motion without prejudice but later agreed to permit supplemental briefing and hold a fair limits hearing on how to apply the new lease rent to PARC's liability. The parties agreed the excess rent from the new tenant would offset PARC's liability from April 2020 forward but disputed whether PARC was entitled to credit from the new lease's excess rent to offset what PARC allegedly owed from December 2016 through March 2020. The superior court concluded that the excess rent should be applied to PARC's past liability.

**¶14** The case proceeded to a jury trial. PARC and Downing moved for judgment as a matter of law under Arizona Rule of Civil Procedure ("Rule") 50(a), and the superior court denied the motions.

**¶15** The jury found in favor of Premier, JJSM and JJSM Equipment and against PARC and Downing on all claims but awarded Premier zero damages for PARC's breach of the cultivation agreement and on its claim against PARC for breach of the duty of good faith and fair dealing. The jury awarded JJSM $1,377,320 on its claim that PARC breached the lease and found the "[r]ent from [JJSM's] replacement tenant, if any, that should reduce damages" was "$0." The jury awarded JJSM Equipment $68,000 on its claim that PARC breached the equipment lease, and $0 on its claim that

---

[1] The remaining defendants were dismissed from the lawsuit before trial and are not parties to this appeal.

PARC breached the duty of good faith and fair dealing. It awarded Premier $125,000 on its claim that Downing tortiously interfered with the cultivation agreement and awarded JJSM Equipment $100,000 on its claim that Downing tortiously interfered with the equipment lease.

¶16         After trial, PARC moved for judgment as a matter of law or for a new trial on JJSM's damages for PARC's breach of the lease. The superior court granted the motion and vacated the $1,377,320 judgment for JJSM's damages for breach of the lease because "JJSM[] fully offset its alleged damages for PARC's breach of the building lease." Premier moved for judgment as a matter of law or for a new trial on damages, and the superior court denied the motion.

¶17         Downing moved for judgment as a matter of law or new trial, which the superior court granted in part, finding as a matter of law that "damages against Downing for tortious interference cannot exceed the contract damages awarded to Premier ($0.00) and JJSM Equipment Fund ($68,000.00)."

¶18         The superior court awarded JJSM and JJSM Equipment attorneys' fees against PARC under the lease and equipment lease, and awarded Premier attorneys' fees pursuant to Arizona Revised Statutes ("A.R.S.") section 12-341.01. After the court ruled on the post-trial motions, it substantially reduced the attorneys' fees awards.

¶19         Premier, JJSM and JJSM Equipment appealed, and PARC and Downing cross-appealed. We have jurisdiction pursuant to A.R.S. § 12-2101(A)(1), (2).

**DISCUSSION**

I.     JJSM's Damages

¶20         JJSM first argues the superior court erred by partially granting PARC's motion for judgment as a matter of law and vacating the jury's damages award for PARC's breach of the lease. The narrow dispute on appeal is whether the rent from JJSM's reletting to its new tenant must be applied to PARC's full liability, or only to its future liability from the date of the reletting.

¶21         We review de novo the superior court's grant of a motion for judgment as a matter of law, considering the evidence in the light most favorable to the non-prevailing party. *Barrett v. Harris*, 207 Ariz. 374, 377, ¶ 9 (App. 2004). The interpretation of leases and other contracts involve questions of law, which we review de novo. *Andrews v. Blake*, 205 Ariz. 236,

240, ¶ 12 (2003). "[L]eases are to be construed so to give effect to the intent of the parties; all of the clauses must be considered and given effect in relation to each other." *Roosen v. Schaffer*, 127 Ariz. 346, 348 (App. 1980).

**¶22**        The superior court vacated the jury's $1,377,320 judgment for JJSM's damages for breach of the lease and awarded nominal damages to JJSM because it concluded, consistent with its earlier ruling, that JJSM fully offset its alleged damages for PARC's breach of the building lease.

**¶23**        Section 17.2 of the lease set forth JJSM's options if PARC defaulted:

> **Rights and Remedies of Landlord.**  If a Default occurs, Landlord shall have the rights and remedies hereinafter set forth, which shall be distinct, separate and cumulative and shall not operate to exclude or deprive Landlord of any other right or remedy allowed it by law or in equity:
>
> (a) Landlord may terminate this lease **by giving to Tenant notice** of Landlord's election to do so, in which event the Term shall end and all right, title and interest of Tenant hereunder shall expire on the date stated in such notice;
>
> (b) Landlord may terminate the right of Tenant to possession of the Premises without terminating this Lease **by giving notice to Tenant** that Tenant's right of possession shall end on the date stated in such notice, whereupon the right of Tenant to possession of the Premises or any part thereof shall cease on the date stated in such notice; and
>
> (c) Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including recovery of all moneys due or to become due from Tenant under any of the provisions of this Lease.

(Emphasis added.)   Thus, if JJSM terminated the lease as provided in 17.2(a), it had contractual remedies under the lease pursuant to section 17.5 ("Final Damages"), and if it gave PARC notice of termination of possession under 17.2(b), it had contractual remedies under section 17.4 ("Current Damages").  Section 17.2(c), the general enforcement provision, did not require notice other than filing suit and did not trigger the contract

6

remedies in sections 17.4 and 17.5.  Therefore, if JJSM did not give notice under sections 17.2(a) or 17.2(b), it could pursue its common law remedies under 17.2(c).

**¶24**　　　　JJSM argued in the superior court that sections 17.2(c) and 17.4 both applied, and under its interpretation of section 17.4, it need not give PARC a credit for any new lease payments for PARC's liability from December 2016 (alleged date of first harvest) through March 2020 (the month before the new lease began).  PARC argued that JJSM must apply the excess rent from its new tenant to PARC's past liability.  Section 17.4 provided, in part:

> **Current Damages.**  If Landlord terminates the right of Tenant to possession of the Premises without terminating this Lease, Landlord shall have the right to immediate recovery of all amounts then due hereunder.  Such termination of possession shall not release Tenant, in whole or in part, from Tenant's obligation to pay the Rent hereunder for the full Term, and Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Base Rent, Rent Adjustments and any other sums accruing as they become due under this Lease during the period **from the date of such notice of termination of possession** to the stated end of the Term.  In any such case, Landlord may relet the Premises . . . for the account of Tenant. . . .  The rents from any such reletting shall be applied first to the payment of the expenses of reentry, redecoration, repair and alterations and the expenses of reletting, **and second to the payment of Rent herein provided to be paid by Tenant.  Any excess or residue shall operate only as an offsetting credit against the amount of Rent due and owing as the same thereafter becomes due and payable hereunder**, and the use of such offsetting credit to reduce the amount of Rent due Landlord, if any, shall not be deemed to give Tenant any right, title or interest in or to such excess or residue, and any such excess or residue shall belong to Landlord solely, and in no event shall Tenant be entitled to a credit on its indebtedness to Landlord in excess of the aggregate sum (including Base Rent and Rent Adjustments) which would have been paid by Tenant for the period for which the credit to Tenant is being determined, had no Default occurred. . . .  Landlord may, at any time and from time to time, sue and recover judgment for any deficiencies

from time to time remaining after the application from time
to time of the proceeds of any such reletting.

(Emphasis added.)

¶25        The superior court found section 17.4 inapplicable because it only applied if JJSM had terminated PARC's right to possession through notice of termination of possession under section 17.2(b), and it had not done so.

¶26        The court also found JJSM had not given written notice to terminate the lease pursuant to section 17.2(a), making section 17.5 inapplicable. The court found JJSM had sued PARC as provided by section 17.2(c) and therefore determined that "general principles of contract law and commercial lease disputes apply." The court then found that under the common law, JJSM must apply the excess rent from the new tenant first to its reletting expenses, and then to PARC's past liability.

¶27        JJSM argues the superior court erred by vacating the jury's award "because: (1) the trial court erred in finding that the terms of the Lease do not govern this dispute; (2) PARC is not entitled to a credit for past due rent under Paragraph 17.4 of the Lease; and (3) alternatively, JJSM was entitled to recover all of PARC's past due rent under Paragraph 17.5." JJSM acknowledges it failed to give notice but argues the superior court should not have found that it "was required to provide futile notice to PARC" after "PARC attempted to unilaterally terminate the Lease, and when that failed, terminated its own right to possession of the property by cancelling its approval to operate."

¶28        First, we disagree that the superior court found the provisions of the lease did not apply. As noted above, after concluding JJSM had not given notice, the court found the general enforcement provision set forth in section 17.2(c) applied rather than sections 17.2(a) and 17.4 or sections 17.2(b) and 17.5.

¶29        The notice requirements in sections 17.2(a) and (b) only arose if PARC materially breached. According to JJSM, it was relieved from its duty to give notice because PARC's material breach of the lease relieved it, as the non-breaching party, from its obligation to give notice. We disagree. The notice requirements in sections 17.2(a)-(b) arise *only* if the tenant defaults. Thus, the fact of default does not excuse the landlord's obligation to provide notice.

¶30     JJSM also argues "even if JJSM was still required to provide notice, its failure to do so was a trivial breach due to PARC's prior conduct." The superior court did not find that JJSM breached the lease by failing to give notice.  The court merely found that by failing to give notice of termination of possession or termination of the lease, JJSM had not completed the steps necessary to invoke sections 17.4 or 17.5.  The lease did not contractually obligate JJSM to give notice under sections 17.2(a) or (b), but it required JJSM to give notice before invoking sections 17.4 or 17.5.

¶31     We find no error in the superior court's determination that only the general enforcement provision in section 17.2(c) and common law principles apply here.  We disagree, however, with the court's common-law analysis.

¶32     "[G]eneral principles of Arizona law . . . provide that, if a lease is not terminated, the landlord may recover unpaid rent due prior to reletting the premises and future rent due for the balance of the lease term, subject to the landlord's duty to mitigate damages by reletting the premises." *Tempe Corp. Office Bldg. v. Ariz. Funding Servs., Inc.*, 167 Ariz. 394, 399 (App. 1991).  No Arizona appellate decision has expressly addressed the issue that has arisen in this appeal: whether, when a new tenant pays a higher rent than the lessee was to have paid under the terms of the lease, the landlord must apply the excess against back rent owed for the period before the new lease began.  This case thus presents a narrow but significant issue of law:  who gets the benefit of the new tenant's payments in excess of the breaching tenant's agreed rental rate?

¶33     When a commercial tenant breaches its lease, Arizona law generally permits the landlord to terminate the tenant's right to possession without terminating the lease itself. *See Roosen v. Schaffer*, 127 Ariz. 346, 349 (App. 1980).  At that point, the tenant remains obligated to pay rent for the full term of the lease, but the landlord is obligated to mitigate damages by making reasonable efforts to relet the premises at a fair rental value. *Id.*; *see also Tempe Corp.*, 167 Ariz. at 399.  "If the landlord makes reasonable but unsuccessful efforts to relet the premises, he is entitled to the full amount of the rent due under the lease." *Tempe Corp.*, 167 Ariz. at 399 (citation omitted).

¶34     These principles are entirely consistent with the jury's verdict here: a landlord like JJSM is entitled to recover from a defaulting tenant like PARC all unpaid rent due prior to reletting the premises as well as future rent for the balance of the lease term subject to a duty to mitigate damages.  PARC argued vigorously at trial that JJSM could have secured a new tenant sooner and thus had failed to mitigate damages—but the jury disagreed.

Because (as implicitly found by the jury) JJSM made reasonable but unsuccessful efforts to relet the premises for several months, JJSM was "entitled to the full amount of the rent due under the lease" for that period—the only period for which JJSM sought damages. *Id.* And once JJSM secured a new tenant, that tenant's rental payments fully defrayed PARC's *future* rent due and thereby appropriately mitigated damages. *See id.*

¶35 There is a split of authority in other jurisdictions that have addressed whether a new tenant's excess rent must also offset past-due rent that had already accrued prior to the new lease. Several jurisdictions hold that a defaulting tenant is *not* entitled to credit excess rent towards unpaid rent owed by the original tenant before the property is re-leased. *See, e.g.*, *Gabin v. Goldstein*, 497 N.Y.S.2d 984, 986–87 (N.Y. Civ. Ct. 1986); *Spitzer v. Selig Enter., Inc.*, 230 S.E. 2d 121, 124 (Ga. Ct. App. 1976); *Waxman Indus., Inc. v. Trustco Dev. Co.*, 455 N.E.2d 376, 379 (Ind. Ct. App. 1983); *Trick v. Eckhouse*, 145 N.E. 587, 588 (Ind. App. 1924); *D.H. Overmeyer Co. v. Blakeley Floor Covering, Inc.*, 266 So. 2d 925, 927 (La. Ct. App. 1972); *N.J. Indus. Props., Inc. v. Y.C. & V.L., Inc.*, 495 A.2d 1320, 1330 (N.J. 1985); *Hargis v. Mel-Mad Corp.*, 730 P.2d 76, 79 (Wash. Ct. App. 1986); *CCS N. Henry, LLC v. Tully*, 624 N.W.2d 847, 849 (Wis. Ct. App. 2000). This approach is consistent with the general principles of damages mitigation discussed above. And it also vindicates Arizona's "general policy of the law to bar a party from benefitting from his own wrong or gaining a windfall." *Phx. Newspapers, Inc. v. Schmuhl*, 114 Ariz. 113, 117 (App. 1976).

¶36 To be sure, several courts in other jurisdictions have held to the contrary and have credited excess rent from a new tenant to the damages (including past-due rent) owed by a defaulting tenant. *See Jack I. Bender & Sons v. Tom James Co.*, 37 F.3d 640, 643 (D.C. Cir. 1994) (landlord who relet property for higher rent than was payable under the original lease was required to credit the surplus against a breaching tenant's rent obligations for the period before the new lease began); *La Casa Nino, Inc. v. Plaza Esteban*, 762 P.2d 669, 674 (Colo. 1988) (same); *Wanderer v. Plainfield Carton Corp.*, 351 N.E.2d 630, 636-37 (Ill. App. Ct. 1976) (same); *Truitt v. Evangel Temple Inc.*, 486 A.2d 1169, 1172-74 (D.C. 1984) (same). But many of those cases involved lease provisions that expressly required a landlord to credit its excess rent to past due amounts owed under the lease and did not rely solely on common law principles. *See, e.g.*, *Dalamagas v. Fazzina*, 414 A.2d 494, 495 (Conn. Super. Ct. 1979) (lease required landlord "to apply the rental payments received as a credit to the lessee [] against the rental due the lessors and the expenses of reletting"); *Centerline Inv. Co. v. Tri-Cor Indus., Inc.*, 80 S.W.3d 499, 504 (Mo. Ct. App. 2002) (lease required landlord

to credit new rents to "all sums due or to become due [to] Landlord hereunder"); *Fields Holding Co. v. Chanbrook Realty Co.*, 246 A.D. 241, 246 (N.Y. App. Div. 1936) (stating that the "remainder [of the rent], if any, to be paid over to the tenant"). Others involve only a claim for a credit to the defaulting tenant for the time the property sat vacant, not for time when the defaulting tenant remained in possession of the property (unlike PARC's request here). *See e.g.*, *Wanderer*, 351 N.E. 2d at 636–37 (defaulting tenant paid rent for six months after vacating the premises).

¶37 Here, the superior court concluded that the excess rent must inure to the benefit of the breaching tenant and be applied to defray past-due rent already accrued, reasoning that to hold otherwise would be a windfall to the landlord. But collecting market value rent from a new tenant (after the original tenant breaches the lease) does not constitute a windfall for the landlord. Instead, the increased rent simply represents a reasonable return on investment based on the value of an asset the landlord owns.

¶38 Moreover, permitting the landlord to collect from the defaulting tenant rent owed before the property is leased to the new tenant does not result in a windfall. The landlord is not being paid twice for the same rental period. And going forward, the landlord is only entitled to rent from one tenant; to the extent a new tenant pays more than the first tenant would otherwise have owed, the breaching tenant is excused from its obligations.

¶39 We conclude that on balance, absent a contractual provision to the contrary, when a tenant breaches a lease agreement, the better approach when rental values increase after the breach is to require the landlord to make reasonable efforts to relet the premises and, when successful, credit a new tenant's excess rents only prospectively to offset the breaching tenant's future (not past-due) obligation. Accordingly, we reverse the superior court's contrary post-trial ruling setting aside the jury's damages award in favor of JJSM.[2]

---

[2] Our decision reinstating the jury's verdict renders PARC's argument on cross-appeal that the superior court improperly awarded JJSM nominal damages ($1) on JJSM's breach of lease claim moot. We also necessarily vacate the nominal damages award.

II.     Exclusion of Premier's Marijuana Inventory Report

¶40          Premier argues the superior court abused its discretion by excluding its "marijuana inventory" report ("the report") and erred by denying its motion for a new trial on this issue.  "A trial court's rulings on the exclusion or admission of evidence will not be disturbed on appeal unless a clear abuse of discretion appears and prejudice results."  *Selby v. Savard*, 134 Ariz. 222, 227 (1982).  The determination of whether, under the circumstances, a business record has sufficient reliability to be entered into evidence is left to the sound discretion of the superior court.  *State v. Petzoldt*, 172 Ariz. 272, 275 (App. 1991).

¶41          At trial, Premier sought to introduce the report under the business records exception to the rule against hearsay.  *See* Ariz. R. Evid. ("Rule") 803(6).  Rule 803(6) sets forth the requirements for laying a proper foundation for the admissibility of a business record.  The proponent of the business record must establish, via the testimony of "the custodian or another qualified witness" that the business record was (1) "made at or near the time by—or from information transmitted by—someone with knowledge," (2) "kept in the course of a regularly conducted activity of a business," and (3) "making the record was a regular practice of that activity."  Ariz. R. Evid. 803(6)(A)-(D).

¶42          Before the superior court can admit a business record under Rule 803(6), the court "must be satisfied that the Rule's conditions concerning the circumstances of the record's preparation and the source of the information contained therein have been met.  Neither the person who witnessed the matters recorded nor the person who created the record are necessary foundational witnesses."  1 Arizona Practice, Law of Evidence § 803:7 (4th ed.).  "The requisite foundation must, however, be established by someone who has personal knowledge or is otherwise familiar with how the record was prepared or with the practice of the business concerning the preparation of records of that type." *Id.*

¶43          Premier sought to introduce the report through the testimony of Premier investor/manager Richard Merel and Premier employee William Artwohl.  When asked how the inventory records were kept, Merel testified:

>    Q:  So who kept them?   And how were they kept contemporaneously with any event if they are an inventory record?
>
>    A:  I can't answer that.  I don't know.

Merel testified that a Premier employee told him the inventory report was kept in the ordinary course of business and admitted he could not "testify that the record was made at or near the time of the event on the document from information transmitted by anyone in particular with knowledge."

¶44 Artwohl knew of the existence of inventory reports but likewise admitted he was not familiar with how the inventory report was prepared:

> Q: My question is that – you've got these reports when the money [investors] came around?
>
> A: Yes, sir.
>
> Q: And you knew that they came from Ryan or somebody at the front. Do you know how they prepared them? . . .
>
> A: Well—
>
> Q: like, an Excel spreadsheet or a printer?
>
> A: I don't know if they went to an Excel spreadsheet, but they would ask these questions all the time. Hey Bill, how many True Power? How many Green Crack? How many slips do we have in the ten, twenties? How many were lost? And I would give the raw data for them to make these. I don't know how the hell they made them.

¶45 Neither of Premier's witnesses gave foundational testimony justifying admission of the inventory report under the business record exception. *See* Ariz. R. Evid. 803(6)(A)-(D). Accordingly, the superior court did not abuse its discretion by excluding the report and did not err by denying Premier's motion for a new trial on that basis.

III.    Jury Instruction on Premier's Damages

¶46 Premier next argues that the superior court erred by instructing the jury to consider as damages only the management fees Premier would have been entitled to under the cultivation agreement. It asserts the superior court "[r]efus[ed] to allow the jury to consider Premier's lost investment as a source of damages . . . ."

¶47       We "review the trial court's refusal to give a requested instruction for an abuse of discretion, but we will not reverse . . . absent resulting prejudice." *Brethauer v. Gen. Motors Corp.*, 221 Ariz. 192, 198, ¶ 24 (App. 2009).

¶48       Before trial, the parties submitted proposed jury instructions, including a number of jointly proposed instructions, including Revised Arizona Jury Instructions ("RAJI") (Civil) Contract 17 (6th ed. 2017)— "Measure of Direct Damages (Breach of Contract) [Modified]." In the middle of the trial, Premier proposed a jury instruction based on RAJI Contract 17 that stated in part, "To determine [Premier's] damages, you should consider the money that Premier lost due to PARC's breach of the Cultivation Agreement."

¶49       During trial the court and the parties discussed the jury instructions before the court instructed the jurors, and counsel for Premier indicated he did not "have any changes to contract 17." Counsel for PARC did suggest changing the instruction, and after a short discussion the court asked the parties, "Okay. So what if I change that first bullet point to say the management fees that Premier would have received under the Cultivation Agreement, had the contract been performed." Counsel for Premier agreed with the change, stating, "That's fine with Plaintiffs." The court ultimately instructed the jurors:

> (Contract # 17) Measure of Direct Damages (Breach of Contract).
>
> If you find that PARC is liable to Premier for breach of the Cultivation Agreement, you must then decide the full amount of money that will reasonably and fairly compensate Premier for the damages proved by the evidence to have resulted naturally and directly from the breach of contract. The damages you award for breach of contract must be the amount of money that will place Premier in the position Premier would have been in if the contract had been performed. To determine those damages, you should consider the following:
>
> - **The management fees that Premier would have received under the Cultivation Agreement had the contract been performed.**
>
> - If you find that PARC breached the Cultivation Agreement but that Premier did not prove damages with

14

reasonable certainty, then you may award nominal damages to Premier (such as $1.00).

(Emphasis added.)

¶50		"A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Ariz. R. Civ. P. 51(c)(1). "A party may assign as error: (A) an error in an instruction actually given, if that party properly objected; or (B) a failure to give an instruction, if that party properly requested it and-unless the court rejected the request in a definitive ruling on the record-also properly objected." Ariz. R. Civ. P. 51(d)(1). "[A]bsent fundamental error, the superior court may not grant a new trial based on an erroneous instruction to which no objection was raised at trial." *Mill Alley Partners v. Wallace*, 236 Ariz. 420, 423, ¶ 8 (App. 2014).

¶51		PARC argues that Premier failed to properly object to the given instruction on contract damages or raise the issue in its motion for a new trial and has waived the issue on appeal. We agree. As noted above, Premier's counsel indicated he was "fine" with the version of the contract damages instruction given by the court. And Premier did not raise any issue about the instruction in its motion for new trial. Premier has not established error, fundamental or otherwise. We find no abuse of discretion.

IV.	Premier's and JJSM Equipment's Damages for Downing's Tortious Interference

¶52		Premier and JJSM Equipment argue the superior court erred by partially granting Downing's motion for judgment as a matter of law and ruling that the tortious interference damages against him could not exceed the amount of contract damages awarded to Premier ($0) and JJSM Equipment ($68,000). Premier alleged, and the jury found, that Downing tortiously interfered with PARC's and Premier's cultivation agreement by causing PARC to breach the agreement, and JJSM Equipment alleged, and the jury found, that Downing tortiously interfered with PARC's and JJSM Equipment's equipment lease by causing PARC to breach the equipment lease. The tortious interference verdicts and judgments were $250,000 for Premier and $100,000 for JJSM Equipment before the superior court reduced them.

¶53          Premier and JJSM Equipment contend that the superior court erred as a matter of law by reducing their damages to match the contract damages awarded against PARC.  The superior court found:

> Plaintiffs had to present competent evidence of damages for [the tortious interference] claims.  But Plaintiffs did not.  They invited the jury to award whatever amount the jury found appropriate.  Plaintiffs did not calculate or quantify damages from the tortious interference.  Thus, the damages against Downing for tortious interference cannot exceed the damages for the underlying breaches of contract.  The jury awarded Premier $0.00 and JJSM Equipment Fund $68,000.00.  The record does not justify greater damage awards against Downing.  The Court will grant Downing's JMOL in part; the damages against him will be the same as the damages against PARC for the breaches.

The superior court acknowledged that tortious interference with contract damages can be more than contract damages for the underlying breach in certain cases but found that Premier and JJSM Equipment had failed to "assert or prove such other damages."

¶54          The court was correct that interference damages may be different from contract damages in cases with appropriate facts.  *See* RAJI (Civil) Commercial Torts 12 (7th ed.) cmt. ("While interference cases generally involve contracts, nevertheless interference with contract is a tort.  Accordingly, the measure of damages is not limited to those allowed in contract actions.  Under appropriate circumstances, the plaintiff may recover damages for emotional distress, injury to reputation, or other consequential damages.") (citing Restatement (Second) of Torts § 774A cmt. D).  But when the only evidence of interference offered by a party is "the lost benefits of the contract which were a direct and natural consequence of the breach," the damages for interference and for breach are "coextensive." *Ross v. Holton*, 640 S.W.2d 166, 173 (Mo. Ct. App. 1982).

¶55          Here, Premier and JJSM Equipment initially proposed a jury instruction on damages for tortious interference covering both "the net benefit that [the plaintiffs] would have received had the contract been performed" and "[c]onsequential losses" caused by the interference.  However, in discussing the final jury instructions, they conceded they had presented no evidence of consequential losses, and the superior court gave a final jury instruction on damages for tortious interference that directed the jury to award damages equal to the "net benefit that a Plaintiff would have received had the contract been performed."  Because the record did

not support damages beyond the lost benefits of the agreements, the court did not err by concluding as a matter of law that Premier and JJSM Equipment could not recover tortious interference damages beyond their contract damages.

## V.     Cross-Appeal/Denial of JMOL on Counts 4, 5, and 13

¶56     In their cross-appeal, PARC and Downing argue the superior court erred by denying PARC's and Downing's Rule 50(b) motions on counts 4 (PARC's breach of the lease), 5 (PARC's breach of the equipment lease), and 13 (Downing's tortious interference with the agreements).

¶57     We review de novo the superior court's denial of a motion for judgment as a matter of law under Rule 50 and will uphold the ruling unless "the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 27-28, ¶ 6 (App. 2011) (citations and internal quotation marks omitted). "[W]e view the evidence in a light most favorable to upholding the jury verdict." *McBride v. Kiekhefer Assocs.*, 228 Ariz. 262, 265, ¶ 10. "When considering motions for directed verdict or JMOL, a trial court may not weigh the credibility of witnesses or resolve conflicts of evidence and reasonable inferences drawn therefrom." *Id.* at ¶ 11. "It is the jury's burden alone to weigh the credibility of witnesses and draw inferences from the evidence presented at trial." *Zuluaga v. Bashas', Inc.*, 242 Ariz. 205, 212, ¶ 21 (App. 2017).

¶58     PARC and Downing argue they were entitled to judgment as a matter of law because no reasonable jury could find that a "first harvest" occurred in December 2016. They also argue PARC's rental obligations were never triggered because JJSM and JJSM Equipment did not give PARC notice of first harvest. In its ruling, the superior court stated that whether and when a first harvest occurred triggering PARC's rental obligations had been a question for the jury, and the jury had decided that question in favor of JJSM and JJSM Equipment.

¶59     The lease and equipment lease made PARC's payment obligations contingent on the "first harvest of cannabis plants," did not define "first harvest," and stated that first harvest shall be "determined in the sole but reasonable discretion" of JJSM and JJSM Equipment. The jury had before it the lease and the equipment lease, and heard testimony from Missner that he and Merel, the principals of JJSM and JJSM Equipment, decided a first harvest had occurred in December 2016 and communicated

that decision to Schaeffer in February 2017. Merel testified that a "first harvest" was "when plants were grown and bloomed in the growing room." He further testified that in December 2016, Schaeffer (via his PARC email address) sent Merel and Missner an email (exhibit 45 which was admitted into evidence) depicting fully-bloomed marijuana plants in several of the facility's grow rooms.

¶60            Artwohl, Premier's consultant, testified that Premier "put flower in the vault" in December 2016, marijuana flower that was "usable" and "had value." Although PARC presented testimony that a first harvest did not occur, the jurors were entitled to resolve the "conflicts of evidence and reasonable inferences drawn therefrom" in favor of JJSM and JJSM Equipment. *See McBride*, 228 Ariz. at 265, ¶ 11.

¶61            PARC argues that its rent obligations were not triggered because neither JJSM nor JJSM Equipment gave it notice that a first harvest occurred in December 2016. The jury heard Missner's testimony, however, that it was Schaeffer, PARC's executive director, who informed JJSM and JJSM Equipment of the first harvest in his December 2016 email. Missner testified that he communicated with Schaeffer again in February 2017 about first harvest during the 45 day post-first harvest abatement period, and no one from PARC ever informed JJSM or JJSM Equipment that it did not believe a first harvest had occurred. The jury was free to reject PARC's argument that a condition precedent, notice of first harvest, did not occur. We find no error with the superior court's denial of PARC's and Downing's motions for judgment as a matter of law on counts 4, 5, and 13.

VI.    Cross-Appeal/Denial of JMOL on Counts 3 and 9

¶62            PARC next argues the superior court improperly denied its Rule 50(b) motion for judgment as a matter of law and erred by amending the jury's verdicts on counts 3 (Premier's claim that PARC breached the cultivation agreement) and 9 (Premier's claim that PARC breached the implied duty of good faith and fair dealing re: the cultivation agreement).

¶63            At trial, the superior court instructed the jury that if it found "that PARC breached the Cultivation Agreement but that Premier did not prove damages with reasonable certainty, then you may award nominal damages to Premier (such as $1.00)." The court similarly instructed the jury that "[i]f you find that a party breached the duty of good faith and fair dealing but other party [sic] did not prove damages with reasonable certainty, then you may award nominal damages (such as $1.00)."

¶64            The jury found in favor of Premier on both claims but found Premier's damages for both claims to be "$0." In its motion for judgment as a matter of law or for new trial on damages, Premier argued in the alternative that the superior court should award it nominal damages of at least one dollar on its breach of contract and breach of the duty of good faith and fair dealing claims against PARC. The court did so, finding that Premier was entitled to "[a] verdict and judgment for nominal contract damages."

¶65            PARC argues that because Premier failed to prove actual damages, it failed to prove an essential element of its contract claim and the superior court was required to enter judgment as a matter of law for PARC. Premier argues the superior court had authority to award nominal damages under Rule 59(a)(1)(E), which allows a party to move for a new trial on the basis that damages are "insufficient."

¶66            In considering the sufficiency of a verdict, the superior court must first determine whether the verdict is so inadequate as to be the result of passion and prejudice. *Jackson v. Mearig*, 17 Ariz. App. 94, 95 (1972). If it is, the court must grant a new trial. *Id.* "On the other hand, if the trial court determines the verdict to be merely insufficient it may exercise its discretion in awarding an additur and denying a new trial." *Id.*

¶67            "The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged. If the breach caused no loss or if the amount of the loss is not proved . . . a small sum fixed without regard to the amount of loss will be awarded as nominal damages." Restatement (Second) of Contracts § 346 (1981). "Unless a significant right is involved, a court will not reverse and remand a case for a new trial if only nominal damages could result." *Id.* at cmt. b.

¶68            "That a jury might choose to award zero actual damages is irrelevant to the legal question of whether, on the basis of the jury's verdict, the plaintiff was entitled to judgment and nominal damages." *Floyd v. Laws*, 929 F.2d 1390, 1402-03 (9th Cir. 1991).

¶69            We find no error in the superior court's exercise of its discretion to change the verdicts from zero to one dollar in nominal damages after the jury found PARC breached the cultivation agreement and breached the implied duty of good faith and fair dealing.

VII.    The Superior Court's Award of Attorneys' Fees

**¶70**         Premier, JJSM, and JJSM Equipment argue the superior court erred by reducing their attorneys' fees awards in light of the court's post-trial rulings.  We review the superior court's decision about attorneys' fees for an abuse of discretion.  *Chase Bank of Ariz. v. Acosta*, 179 Ariz. 563, 574 (App. 1994).  "A contractual provision for attorneys' fees will be enforced according to its terms."  *Id.* at 575.  "Unlike fees awarded under A.R.S. § 12-341.01(A), the court lacks discretion to refuse to award fees under the contractual provision."  *Id.*

**¶71**         Here, the lease and equipment lease contained fee-shifting provisions referring to "reasonable" attorneys' fees.  The cultivation agreement did not.  The superior court originally awarded JJSM, JJSM Equipment, and Premier reasonable attorneys' fees of $441,685.61.  But in light of the post-trial rulings, the court cut the fee award in half and awarded the plaintiffs $220,842.80.

**¶72**         "In cases involving varied success on multiple claims . . . it is appropriate for the trial court to use a percentage of success factor or a totality of the litigation test to determine who is the successful party."  Arizona Attorneys' Fees Manual § 2.7.1, at 2-23 (6th ed. 2017) (citations and internal quotation marks omitted).

**¶73**         Because we reverse the superior court's ruling vacating the jury's verdict in favor of JJSM, we vacate the court's attorneys' fees award and remand to the superior court for a redetermination of attorneys' fees.

VIII.  Attorneys' Fees on Appeal

JJSM requests attorneys' fees under section 17.8 of the lease, JJSM Equipment requests fees under paragraph 10 of the equipment lease, and Premier seeks fees under A.R.S. § 12-341.01(A).  PARC requests its fees and costs on appeal and cross-appeal pursuant to A.R.S. §§ 12-341, -341.01, -342.  Even when attorneys' fees are authorized by contract or statute, we may still exercise our discretion to deny an award of attorneys' fees on appeal.  Arizona Attorneys' Fees Manual § 10.2 at 10-2.  We exercise our discretion to deny attorneys' fees.

## CONCLUSION

**¶74** For the foregoing reasons, we reverse the superior court's post-trial ruling setting aside the jury's damages award in favor of JJSM, vacate the court's attorneys' fees award, and remand to the superior court for a redetermination of attorneys' fees, and otherwise affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA